# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: June 5, 2026

```
* * * * * * * * * * * * * *   *
RICHARD TRUDELL,                *        PUBLISHED
                                *
          Petitioner,           *        No. 21-1887V
                                *
v.                              *        Special Master Nora Beth Dorsey
                                *
SECRETARY OF HEALTH             *        Dismissal; Influenza ("Flu") Vaccine;
AND HUMAN SERVICES,             *        Polymyalgia Rheumatica ("PMR");
                                *        Seronegative Rheumatoid Arthritis ("RA").
          Respondent.           *
                                *
* * * * * * * * * * * * * *   *
```

Edward Kraus, Kraus Law Group, Chicago, IL, for Petitioner.
Sarah Rifkin, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION[1]

On September 22, 2021, Richard Trudell ("Petitioner") filed a petition in the National Vaccine Injury Program[2] alleging that as a result of receiving an influenza ("flu") vaccine on November 16, 2018, he suffered polymyalgia rheumatica ("PMR"). Petition at Preamble (ECF No. 1). Respondent argued against compensation, stating that "this case is not appropriate for compensation under the [Vaccine] Act." Respondent's Report ("Resp. Rept.") at 2 (ECF No. 16).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018) ("Vaccine Act" or "the Act"). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[3] the undersigned finds that Petitioner has failed to provide preponderant evidence that the flu vaccination caused his illness. Thus, Petitioner has failed to satisfy his burden of proof under <u>Althen v. Secretary of Health & Human Services</u>, 418 F.3d 1274, 1280 (Fed. Cir. 2005). Accordingly, Petitioner is not entitled to compensation.

## I.    ISSUES TO BE DECIDED

The parties dispute whether Petitioner has established a diagnosis of PMR. Joint Submission ("Joint Sub."), filed June 17, 2025, at 2 (ECF No. 76). Respondent contends the correct diagnosis is seronegative rheumatoid arthritis ("RA"). Resp. Pre-hearing Brief ("Resp. Br."), filed June 17, 2025, at 14-15 (ECF No. 77). Additionally, the parties dispute whether Petitioner has established all three <u>Althen</u> prongs. Joint Sub. at 2.

## II.    BACKGROUND

### A.    Procedural History

On September 22, 2021, Petitioner filed a petition requesting compensation followed by medical records and an affidavit.[4] Petition; Petitioner's Exhibits ("Pet. Exs.") 1-17. The case was then assigned to the undersigned. Notice of Reassignment dated Mar. 10, 2022 (ECF No. 12). Respondent filed a Rule 4(c) report on May 9, 2022, arguing against compensation. Resp. Rept. at 2.

Thereafter, the parties filed expert reports. On July 6, 2022, Petitioner filed an expert report from Dr. M. Eric Gershwin. Pet. Ex. 18. On February 3, 2023, Respondent filed an expert report from Dr. Mehrdad Matloubian. Resp. Ex. A. And Petitioner filed a supplemental expert report from Dr. Gershwin on May 4, 2023. Pet. Ex. 72.

The undersigned held a Rule 5 conference on June 27, 2023. Order dated June 27, 2023 (ECF No. 46). The undersigned did not make a preliminary finding on diagnosis or causation. <u>Id.</u> at 2. The undersigned recommended the parties resolve the case through settlement and ordered supplemental expert reports. <u>Id.</u> at 3.

---

[3] While the undersigned has reviewed all of the information filed in this case, only those filings and records that are most relevant will be discussed. <u>See</u> <u>Moriarty v. Sec'y of Health & Hum. Servs.</u>, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision."); <u>see also</u> <u>Paterek v. Sec'y of Health & Hum. Servs.</u>, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[4] Petitioner continued to file medical records throughout litigation.

Petitioner filed a supplemental expert report from Dr. Gershwin on October 2, 2023.  Pet. Ex. 79.  Respondent filed a supplemental report from Dr. Matloubian on January 29, 2024.  Resp. Ex. C.  Petitioner filed a final supplemental report from Dr. Gershwin on April 8, 2024.  Pet. Ex. 83.

On September 10, 2024, the parties requested an entitlement hearing.  Joint Status Rept., filed Sept. 10, 2024 (ECF No. 66).  An entitlement hearing was set for July 22 and July 23, 2025.  Prehearing Order dated Sept. 10, 2024 (ECF No. 67).

Petitioner filed a prehearing brief on June 3, 2025, and Respondent filed his prehearing brief on June 17, 2025.  Petitioner's Prehearing Memorandum ("Pet. Br."), filed June 3, 2025 (ECF No. 74); Resp. Br.

An entitlement hearing was held July 22, 2025.  Tr. 4.  Dr. Gershwin and Dr. Matloubian testified.  Tr. 6-191.

On September 20, 2025, the parties confirmed that they would not file post-hearing briefs, agreed the record was closed, and requested the undersigned issue a decision on entitlement.  Joint Status Rept., filed Sept. 10, 2025 (ECF No. 105).

This matter is now ripe for adjudication.

### B.      Factual History

### 1.      Summary of the Medical Records[5]

Petitioner was 60 years old at the time of vaccination.  Pet. Ex. 4 at 50.  His lengthy medical history included treatment for obesity; hypertension; severe osteoarthritis[6] in both knees, resulting in partial bilateral knee replacements (2016 and 2017); chronic right shoulder pain; low back pain resulting in laminectomy (2005 and 2015); prostate cancer (2012); and hepatitis C.  See Pet. Ex. 5 at 10-13, 19-20, 22-23.  He received flu vaccines in 2015, 2016, and 2017.  Id. at 9, 21; Pet. Ex. 4 at 57.  Despite his various health issues, Petitioner operated a swimming pool construction company near Boise, Idaho and continued to engage in strenuous construction work on a near-daily basis.  See Pet. Ex. 2 at 36; Pet. Ex. 17 at ¶ 2.

---

[5] This summary of medical records is largely taken from the parties' briefs, with edits from the undersigned, as the undersigned finds they provided an accurate representation of the records.  See Pet. Br. at 1-8; Resp. Br. at 3-10.

[6] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity."  Osteoarthritis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=35780 (last visited Apr. 9, 2026).

On November 16, 2018, Petitioner visited his primary care provider ("PCP"), Joshua Durham, D.O., for an annual check-up. Pet. Ex. 4 at 50. Petitioner reported chronic knee pain and his review of symptoms documented joint pain and swelling, although the location of his discomfort was not specified. Id. at 50-51. Petitioner's bloodwork was normal, apart from a slightly elevated glucose level. Pet. Ex. 6 at 2-3. Dr. Durham referred Petitioner to his orthopedist for his knee pain. Pet. Ex. 4 at 52. During this visit, Petitioner received the flu vaccine at issue in his right deltoid. Id. at 53.

Thirteen days after his vaccination, on November 29, 2018, Petitioner saw Steven Daines, M.D., the orthopedic surgeon who had performed his prior knee replacements. Pet. Ex. 2 at 14. Petitioner reported pain and swelling in his right knee. Id. He stated that he "continue[d] to work very hard in construction," and that he had experienced right knee pain since rolling his right ankle three weeks earlier. Id. Dr. Daines noted a slight limp and some swelling around the right knee. Id. Dr. Daines suspected a muscle strain and ordered bloodwork to rule out infection. Id. at 15. Petitioner's bloodwork revealed elevated C-reactive protein ("CRP")[7] (8.00 mg/dL; reference range < 1.00) and erythrocyte sedimentation rate ("ESR") [8] (45.0 mm/hr; reference range 0.0-20.0). Pet. Ex. 10 at 19-20; see also Pet. Ex. 7 at 3-5. On November 30, 2018, Petitioner underwent an ultrasound-guided aspiration of his right knee to check for infection. Pet. Ex. 2 at 12. Dr. Daines reviewed the results, which showed no crystallization and were "very reassuring against infection." Id. at 15.

On December 19, 2018, 33 days after vaccination, Petitioner returned to his PCP, Dr. Durham. Pet. Ex. 4 at 44. Petitioner stated that his "prior injuries were all stiff." Id. He reported that, on or around December 17, 2018, he woke up with diffuse joint stiffness and could "hardly move at all" for 45 minutes. Id. On examination, Dr. Daines noted bilateral shoulder and hip weakness, plus decreased range of motion. Id. at 44, 47. Repeat bloodwork, taken December 17, 2018, again showed elevated CRP (5.80 mg/dL; reference range <1.00) and ESR (43.0 mm/hr; reference range 0.0-20.0) but negative rheumatoid factor ("RF")[9] and no

---

[7] CRP "is an acute-phase reactant protein used to indicate to indicate an inflammatory illness." C-Reactive Protein, Mosby's Manual of Diagnostic and Laboratory Tests 165 (6th ed. 2018). Mosby's at 165.

[8] ESR is "a measurement of the rate at which red blood cells . . . settle in saline solution or plasma over a specified time period." Erythrocyte Sedimentation Rate, Mosby's at 200. "ESR is a nonspecific test used to detect illnesses associated with acute and chronic infection, inflammation . . ., advanced neoplasm, and tissue necrosis or infarction." Id. at 199.

[9] RF are "antibodies. . . [that] are found in the serum of about 80 percent of persons with classical or definite [RA] . . . [and] also occur in other connective tissue diseases and some infectious diseases." Rheumatoid Factor, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=74591(last visited Apr. 15, 2026).

antinuclear antibodies ("ANA").[10]  Id. at 44; Pet. Ex. 10 at 12-14.  Dr. Durham's assessment was PMR.  Pet. Ex. 4 at 47.  He ordered an ANA panel, prescribed 40 mg of prednisone (with a 10 mg taper every five days), and suggested that Petitioner consult a rheumatologist.  Id.

Subsequently, on December 19, 2018, Petitioner's ANA panel revealed a homogenous ANA nuclear pattern most commonly associated with lupus patients.  Pet. Ex. 4 at 43.

Petitioner returned to Dr. Durham for follow-up care on December 26, 2019.  Pet. Ex. 4 at 39.  Petitioner stated that he was "instantly . . . better" after taking 40 mg of prednisone, and he demonstrated full strength with no pain.  Id.  Dr. Durham repeated his assessment of "presumptive PMR" and planned to slowly taper Petitioner's prednisone dose.  Id. at 39, 43.

On January 14, 2019, Petitioner was evaluated at the Idaho Arthritis Center by Kyle George, PA-C.  Pet. Ex. 3 at 6.  PA George noted that Petitioner had experienced an "abrupt onset of myalgias involving the proximal upper and lower extremities as well as some arthralgias of the upper extremities with steroid responsiveness and elevated inflammatory markers."  Id.  Petitioner reported intermittent symptom flares involving joint pain and weakness of his hips, shoulders, and hands with a pain rating of 10/10.  Id. at 7.  A physical examination of Petitioner's joints found tender joints in the left shoulder, right shoulder, left elbow, right elbow, left ankle, and right ankle.  Id.  All other joints were "found to be non-tender and non-swollen."  Id.  PA George felt that Petitioner's "history [was] suspicious for [PMR]; however, [Petitioner] reportedly had some continued flaring despite [taking] 40 mg prednisone daily."  Id. at 6.  There was "still [a] possibility of [RA] or another reactive type arthritis" but these diagnosis were "lower in the differential."  Id.  Additionally, PA George had "low suspicion" for connective tissue disease.  Id.  He ordered additional testing and recommended Petitioner decrease his prednisone dosage to 30 mg with a continued taper.  Id.

Bloodwork taken January 14, 2019 remained positive for inflammatory markers but was otherwise unremarkable.  Pet. Ex. 3 at 12, 14-17.  Petitioner had elevated CRP (2.0 mg/dL; reference range < 1.0) and ESR (25.0 mm/hr; reference range 0.0-20.0).  Id. at 16.

Petitioner followed up with his PCP, Dr. Durham, on January 23, 2019.  Pet. Ex. 4 at 34.  Petitioner reported that his joint pain returned when he reduced his prednisone dose to 30 mg, so he had returned to the 40 mg dose.  Id.  He reported that when his symptoms were active, he had severe pain and weakness and difficulty performing his construction work.  Id.  Dr. Durham prescribed Norco for pain management.  Id. at 37.

On January 28, 2019, Petitioner had a follow-up visit to the Idaho Arthritis Center.  Pet. Ex. 3 at 11.  PA George assessed Petitioner with "likely atypical [PMR]."  Id.  According to PA George, Petitioner's presentation was "atypical" because "he continued to have some symptoms despite 40 mg of prednisone as well as some difficulty in tapering to 30 mg daily."  Id.  PA

---

[10] Antinuclear antibodies are "antibodies directed against nuclear antigens . . . frequently found in [RA], scleroderma (systemic sclerosis), Sjögren syndrome, and mixed connective tissue disease."  Antinuclear Antibodies, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56804 (last visited Apr. 15, 2026).

George also considered "seronegative [RA] in the differential." Id. PA George noted an unremarkable comprehensive ANA panel, an elevated ESR (23.0 mm/hr; reference range 0.0-20.0), and normal CRP. Id. at 11, 14. Petitioner's joint examination showed a DAS28 score[11] of 1.85. Id. at 12.

PA George recommended an ultrasound evaluation of Petitioner's hands and noted that if erosive changes were identified, proceeding with treatment for seronegative RA might be indicated. Pet. Ex. 3 at 11. A bilateral ultrasound of Petitioner's hands, taken January 28, 2019, showed "mild to moderate synovitis[12] throughout." Pet. Ex. 9 at 30.

On April 2, 2019, Petitioner returned to the Arthritis Center, where he saw rheumatologist Eric Palfreyman, M.D. Pet. Ex. 3 at 18. Dr. Palfreyman's assessment was:

> likely atypical [PMR] given abrupt onset of myalgias involving the proximal upper and lower extremities as well as some arthralgias of the upper extremities with steroid responsiveness and elevated inflammatory markers. Atypical is the fact that he continued to have some symptoms despite 40 mg of prednisone as well as some difficulty in tapering to 30 mg daily. . . . Seronegative [RA] in the differential particularly given mild to moderate synovitis noted on ultrasound and predominant involvement of hands and wrists, but this has normalized in the setting of continued prednisone.

Id. He also noted that "[p]seudogout was also possible given [the] chondrocalcinosis"[13] in Petitioner's hand joints. Id. The joint examination revealed a DAS28 score of 1.26. Id. at 19.

---

[11] DAS, or disease activity score, is a "composite continuous measure of RA disease activity" that includes the number of painful joints, ESR or CRP level, and patient global assessment on a visual analogue scale. Resp. Ex. G at 3 (Tate M. Johnson et al., Measures of Rheumatoid Arthritis Disease Activity, 72 Arthritis Care & Rsch. 4 (2020)). DAS28 is a modified version of DAS that uses 28-joint count. Id. DAS28 is measured on a scale of 0 to 9.4. Id. "Disease activity levels for the DAS28 are interpreted as follows: remission, less than 2.6; low disease activity, 2.6 to less than 3.2; moderate disease activity, 3.2 to less than 5.1; and high disease activity, greater than or equal to 5.1." Id. at 4.

[12] Synovitis is "inflammation of a synovial membrane[,]" which lines a joint cavity and secretes synovial fluid. Synovitis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=48576 (last visited May 29, 2026); Membrana Synovialis Capsulae Articularis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=88558 (last visited May 29, 2026). Synovitis "is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within the synovial sac." Id.

[13] Chondrocalcinosis refers to "the presence of calcium salts, especially calcium pyrophosphate, in the cartilaginous structures of one or more joints." Chondrocalcinosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=9466 (last visited Apr. 15, 2026).

6

Dr. Palfreyman observed that Petitioner was now able to make a complete fist "as he was unable to previously" and he noted that all joints were "non-tender and non-swollen." Id. Dr. Palfreyman noted "[s]ome improvement" of Petitioner's ESR since the last visit and he ordered additional testing. Id. at 18-19. Petitioner was taking 25 mg of prednisone, and he was advised to further taper his use of prednisone. Id.

On June 4, 2019, Petitioner saw PA George for follow-up care. Pet. Ex. 3 at 22. The assessment remained atypical PMR. Id. The assessment also included "[i]nflammatory polyarthropathy of multiple sites." Id. Petitioner was tolerating 10 mg of prednisone without symptom recurrence. Id. at 23. On examination, all joints were "found to be non-tender and non-swollen." Id. Petitioner's DAS28 score was 0.96. Id. His ESR and CRP had normalized, and PA George recommended further tapering of prednisone. Id. at 22-23.

On August 23, 2019, Petitioner saw his PCP, Dr. Durham, for a medication refill and treatment for hand fungus. Pet. Ex. 4 at 29. Dr. Durham noted Petitioner's chronic knee and joint pain and his prior knee replacements. Id. Petitioner had tapered his dose of prednisone to four milligrams daily and was taking Norco for pain. Id. He reported that he "work[ed] a lot and [was] pretty beat up." Id. The physical examination noted joint tenderness in his knees, shoulders, hands, and wrists. Id. at 32. Dr. Durham's assessment was PMR and Tinea unguium (fungus). Id.

Petitioner returned to PA George on September 3, 2019, with recurrent symptoms, including joint pain, muscle aches, morning stiffness, and difficulty walking, while taking 4 mg of prednisone. Pet. Ex. 3 at 26-27. Petitioner had increased his prednisone dosage to 10 mg per day "with benefit." Id. at 27. Assessment was PMR and inflammatory polyarthropathy. Id. On examination, Petitioner's DAS28 score was 1.17. Id. PA George recommended a lower prednisone dose and possible disease-modifying antirheumatic drug ("DMARD")[14] therapy if Petitioner continued to have difficulty tapering off prednisone. Id. at 26.

Petitioner saw his rheumatologist, Dr. Palfreyman, on December 19, 2019. Pet. Ex. 3 at 31. He was taking 2 mg of prednisone daily without flares of his joint symptoms. Id. He reported occasional stiffness in colder weather but, overall, rated his pain at a 1/10. Id. at 32. An examination showed no tenderness or swelling, but Dr. Palfreyman noted stable Heberden's and

---

[14] DMARD are "a group of antirheumatic agents that can modify the course of disease, as opposed to providing only symptomatic relief." Disease-Modifying Antirheumatic Drug, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=71657 (last visited Apr. 15, 2026).

Bouchard's nodes[15] in Petitioner's fingers.  Id.  The DAS28 score was 1.10.  Id.  Assessment remained PMR and inflammatory polyarthropathy.  Id. at 37.

On January 2, 2020, Petitioner saw his PCP.  Pet. Ex. 4 at 24.  The review of systems was positive for back pain, joint pain, and joint swelling.  Id. at 26.  Petitioner reported that he had about four days of prednisone left in his taper, and he requested refills of pain medication for his chronic pain.  Id. at 24, 26.  Assessment was PMR and bilateral chronic knee pain.  Id. at 27.

Petitioner returned to the Arthritis Center on March 10, 2020.  Pet. Ex. 3 at 35.  By this time, he had been off prednisone for two months without any joint flares.  Id.  He reported some swelling and pain in his left hand, elbow, and shoulder, which Dr. Palfreyman opined was "more likely" attributable to degenerative osteoarthritis.  Id.  An examination showed tenderness in the left shoulder, elbow, and hand, with stable Heberden's and Bouchard's nodes.  Id. at 36.  The DAS28 score was 2.85.  Id.  Petitioner was taking Norco for pain.  Id.  Dr. Palfreyman recommended over-the-counter naproxen and a short course of prednisone if Petitioner's symptoms did not improve.  Id. at 35.  At this visit, assessment was PMR with "lower suspicion for inflammatory joint pain" and concurrent diagnosis of degenerative osteoarthritis.  Id.

On May 6, 2020, Petitioner saw his PCP, Dr. Durham.  Pet. Ex. 4 at 19.  Dr. Durham noted that Petitioner's PMR had gone "into remission."  Id.  However, Petitioner reported "recent increases" in pain in his hands, elbows, and shoulders, with numbness and tingling in his arms.  Id.  Petitioner stated that he was still working in construction.  Id.  His symptoms were worse in the morning at the end of the day and after breaks but seemed to improve with activity.  Id.  Petitioner reported that a recent prednisone taper had not helped with his symptoms, and he required pain medication to "make it through the day."  Id.  Dr. Durham diagnosed lumbar radiculopathy,[16] for which he prescribed continued use of Norco, and bilateral carpal tunnel syndrome,[17] for which he prescribed Mobic and wrist braces.  Id. at 21-22.

---

[15] Heberden nodes are "small hard nodules, formed usually at the distal interphalangeal joints of the fingers, produced by calcific spurs of the articular cartilage and associated with interphalangeal osteoarthritis" while "[s]uch nodules in the proximal interphalangeal nodes are called Bouchard nodes."  Heberden Nodes, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=92979 (last visited Apr. 15, 2026).

[16] Lumbar radiculopathy refers to "any disease of lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias."  Lumbar Radiculopathy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=101394 (last visited Apr. 15, 2026).

[17] Carpal tunnel syndrome is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow. Symptoms result from compression of the median nerve in the carpal tunnel."  Carpal Tunnel Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110370 (last visited Apr. 15, 2026).

On November 18, 2020, Petitioner saw another rheumatologist, Peggy Rupp, M.D., of the Boise Arthritis and Immunology Clinic.  Pet. Ex. 8 at 5.  In a letter to Dr. Durham describing the encounter, Dr. Rupp noted that Petitioner had a "somewhat troublesome" history of PMR.  Id.  She noted that Petitioner was initially diagnosed in 2018, and had an "excellent response to use of prednisone."  Id.  However, after weaning off prednisone, Petitioner reported renewed pain and stiffness in his shoulders, hands, hips, and knees.  Id.  Dr. Durham had restarted Petitioner on a "modest dose of prednisone;" however, according to Dr. Rupp, Petitioner had "increased it on his own to 30 mg."  Id.  Petitioner told Dr. Rupp that his symptoms had improved, and he was "function[ing] well with little discomfort."  Id.  Dr. Rupp noted Petitioner's history of spinal surgeries and his daily use of Norco.  Id.  A physical examination showed bony enlargement of the distal finger joints in both hands; angulation of the finger joints; reduction in hand closure; and modest deformity of the knees.  Id. at 5-6.  An X-ray of the hands revealed "definite changes of degenerative arthritis," with large osteophytes and lost cartilage in the fingers.  Id. at 6.  In her letter to Dr. Durham, Dr. Rupp concluded,

> I do believe that much of [Petitioner's] discomfort is more due to osteoarthritis and do not believe that he should require the 30 mg dose of prednisone.  I think he is using the prednisone to control both his symptoms of PMR as well as osteoarthritis and as you know it requires high doses of corticosteroids to have an impact on osteoarthritis.

Id.  Dr. Rupp recommended a trial of Voltaren[18] and a reduced dose of prednisone.  Id.

Several weeks later, on December 8, 2020, Petitioner returned to Dr. Palfreyman at the Idaho Arthritis Center "with suspicion for recurrence of atypical [PMR]."  Pet. Ex. 3 at 39.  Petitioner reported experiencing muscle and joint pains over the past few months, beginning with his hands and progressing to his knees, shoulders, forearms, hips, and lower extremities.  Id. at 40.  He reported that he was currently taking 20 mg prednisone with some persistent symptoms.  Id.  Dr. Palfreyman assessed that while Petitioner had concurrent osteoarthritis, that condition would not explain the steroid responsive proximal muscle aches and joint pain.  Id. at 39.  Dr. Palfreyman specifically considered seronegative RA in the differential but noted that Petitioner had "more proximal joint involvement."  Id.  Petitioner's proximal joint involvement appears to be the reason why Dr. Palfreyman did not consider seronegative RA to be the primary diagnosis.  See id.  An examination showed tenderness in the shoulders, elbows, right hand, and right wrist, with stable Heberden's and Bouchard's nodes.  Id. at 40.  The DAS28 score was 3.41.  Id.  Dr. Palfreyman prescribed a gradual steroid taper and discussed the possibility of disease modifying therapy in the future.  Id. at 39.

On January 19, 2021, Petitioner attended a telehealth visit with Dr. Palfreyman.  Pet. Ex. 3 at 44.  Petitioner stated that he had recently stopped taking prednisone completely.  Id. at 45.  He experienced muscle aches, plus recurrent joint pain in his shoulders, elbows, wrists, hips, and

---

[18] Voltern, known generically as diclofenac sodium, is "administered orally in the treatment of [RA], osteoarthritis, and ankylosing spondylitis and also for a variety of nonrheumatic inflammatory conditions."  Diclofenac Sodium, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=69745 (last visited Apr. 15, 2026).

knees.  Id.  Dr. Palfreyman recommended restarting prednisone at a 12.5 mg dose and initiating treatment with Plaquenil (a DMARD) to help Petitioner taper off prednisone without symptom recurrence.  Id. at 44.  Assessment remained PMR and inflammatory polyarthropathy.  Id.

Petitioner next visited the Idaho Arthritis Center on April 22, 2021 for a follow-up appointment with PA George.  Pet. Ex. 9 at 19.  Petitioner reported "generalized joint pain particularly involving his hands, elbows, [and] knees."  Id. at 20.  Petitioner had unilaterally altered his prednisone dosage, raising his dosage from five milligrams to 30 milligrams, before settling at 20 milligrams.  Id.  Petitioner did not tolerate Plaquenil and PA George substituted sulfasalazine.  Id. at 19, 21.  PA George noted Petitioner's "joint symptoms are much more severe than muscle symptoms as he decreases his prednisone."  Id. at 19.  His DAS28 score was 1.45.  Id. at 20.  Assessment was PMR and inflammatory arthritis.  Id. at 19.

On June 18, 2021, Petitioner returned to PA George.  Pet. Ex. 9 at 23.  The assessment was recurrent atypical PMR.  Id.  Seronegative RA remained a differential diagnosis.  Id.  Petitioner had ceased using prednisone "sooner than expected" and had experienced an exacerbation of symptoms in the week prior to his appointment.  Id.  PA George noted, "Overall he is doing well in regards to joint pain and myalgias; however, recently has had some slight increase [in symptoms]."  Id.  Petitioner's bloodwork was normal.  Id. at 26-27.  His DAS28 score was 1.73.  Id. at 24.

Petitioner continued to seek treatment for recurrent flares of joint pain.  During a visit to the Idaho Arthritis Center on September 1, 2021, PA George referred to Petitioner's ongoing symptoms as an "exacerbation of polyarticular joint pain" and "intermittent inflammatory arthritis symptoms."  Pet. Ex. 70 at 4.  Petitioner was no longer taking prednisone but continued to take sulfasalazine daily.  Id.  PA George noted that Petitioner's current symptoms were "less suggestive" of PMR.  Id.  On examination, Petitioner had joint tenderness in his left hand and was unable to make a closed fist with either fist.  Id. at 5.  The DAS28 score was 3.54.  Id.  Petitioner began methotrexate.  Id. at 6.  Assessment remained inflammatory arthritis and PMR.  Id. at 4.

Petitioner had follow-up visits with PA George in October 2021, December 2021, and February 2022.  Pet. Ex. 70 at 9-23.  At each visit, the assessment noted an "initial working diagnosis of atypical [PMR]" as well as "peripheral joint involvement and symptoms . . .  more suggestive of a seronegative inflammatory arthropathy."  Id. at 9, 14, 19.

During a follow-up visit to the Idaho Arthritis Center on May 23, 2022, Dr. Palfreyman appeared to echo this assessment, noting that, although Petitioner had an initial working diagnosis of PMR, his "[s]table peripheral joint involvement and symptoms are more suggestive of a seronegative inflammatory arthropathy."  Pet. Ex. 70 at 25.  On examination, Petitioner had tender joints in both hands, stable Heberden's and Bouchard's nodes, and was unable to make a complete fist with either hand.  Id. at 26.  His DAS score was 3.24.  Id.  Dr. Palfreyman noted there was no evidence to suggest recurrence of PMR.  Id. at 25.  Dr. Palfreyman also opined that Petitioner also suffered from osteoarthritis at multiple sites and this was the "more likely issue contributing to his generalized joint pain."  Id.

10

Petitioner continued to be followed by PA George and Dr. Palfreyman at the Idaho Arthritis Center with follow-up visits in August 2022, November 2022, March 2023, June 2023, and August 2023. Pet. Ex. 76 at 11, 16, 22, 27, Pet. Ex. 85 at 3. The assessment at each of these visits remained "initial working diagnosis of atypical [PMR]" as well as "[s]table peripheral joint involvement and symptoms . . . more suggestive of a seronegative inflammatory arthropathy." Id.

On December 7, 2023, Petitioner was seen by PA George. Pet. Ex. 85 at 10. The assessment was now "initial working diagnosis of seronegative inflammatory arthritis versus atypical [PMR]." Id. Petitioner continued to have "intermittent inflammatory arthritis symptoms." Id. Addressing PMR, PA George noted Petitioner's current "constellation of symptoms are without muscle involvement." Id. A physical examination was normal except for an inability to make a fist bilaterally. Id. at 11-12. His DAS28 score was 1.66. Id. at 12.

On March 5, 2024, Petitioner had a follow-up visit with Dr. Palfreyman. Pet. Ex. 85 at 16. Dr. Palfreyman now opined that Petitioner had a

> working diagnosis of seronegative inflammatory arthritis/[RA] in the setting of abrupt onset of myalgias involving the proximal upper and lower extremities as well as some arthralgias of the upper extremities with steroid responsiveness and elevated inflammatory markers with peripheral joint involvement and symptoms, ultrasound examination of the hands and wrists with mild-to-moderate synovitis. Initially, differential included the possibility of [PMR]. Onset of symptoms approximately [one] month following flu vaccination which suggest the possibility that this could have been a triggering factor of onset of symptoms.

Id. Dr. Palfreyman also noted concurrent degenerative/osteoarthritis. Id. While PMR remained in the assessment list, Dr. Palfreyman noted there was "[n]o evidence to suggest interval recurrence." Id.

Petitioner returned to Dr. Palfreyman on June 13, 2024. Pet. Ex. 85 at 22. The assessment remained "working diagnosis of seronegative inflammatory arthritis/[RA]." Id. Petitioner's last documented visit to the Arthritis Center occurred on December 9, 2024. Id. at 29. The assessment again remained "working diagnosis of seronegative inflammatory arthritis/[RA]." Id. The assessment also included diagnosis of PMR and osteoarthritis. Id. at 29-30. At the visit, Dr. Palfreyman and Petitioner discussed "long-term management of inflammatory arthritis and osteoarthritis." Id. at 29.

No additional relevant records were filed.

### 2.    Petitioner's Affidavit

Petitioner filed one affidavit, executed September 11, 2021, addressing the onset of symptoms, his clinical course, and the impact of his condition on his life. Pet. Ex. 17.

11

Prior to November 2018, Petitioner described his health as "stable" and noted his history of "chronic localized lower back and knee pain from degenerative joint disease." Pet. Ex. 17 at ¶ 2. He worked in construction and performed "strenuous physical activity." Id.

On November 16, 2018, Petitioner received a flu vaccine. Pet. Ex. 17 at ¶ 3. Petitioner averred that the morning of December 17, 2018, he woke up and "could barely move." Id. at ¶ 4. Petitioner explained he had severe pain in his hips and shoulders along with stiffness and weakness in his joints and muscles. Id. "This pain and weakness was very different than the joint pain [he] had experienced in the past." Id. Because of these symptoms, Petitioner went to his PCP on December 19, 2018. Id. at ¶ 5. Petitioner averred he was diagnosed with PMR and told "that the flu vaccine was the most likely trigger for the illness." Id. The remainder of Petitioner's affidavit largely recounted his clinical course as documented in the medical records. Id. at ¶¶ 6-12.

Addressing the impact of his illness, Petitioner explained that fatigue from his condition has left him "barely able to manage the physical demands" of his work, and his activities are "significantly limited." Pet. Ex. 17 at ¶ 13. Before his illness, Petitioner averred he was "energetic" and "live[d] a full life that included . . . work, family, social and leisure activities." Id. Petitioner further explained his "quality of life has diminished greatly." Id. at ¶ 14. As of September 2021, he continued to experience "pain and weakness every day." Id. Petitioner averred he expects to remain on disease modifying and other hazardous medications for the rest of his life and his doctor told him he was "unlikely to experience a remission from [his] PMR." Id. Finally, Petitioner explained that in addition to physical discomfort, chronic pain from his illness has caused his emotional health to decline and he is "less happy, energetic, and fulfilled" than before his illness. Id. at ¶ 15.

### 3.      Letters from Joshua Durham, D.O.

Petitioner's PCP, Dr. Durham, provided two letters addressing Petitioner's condition. Pet. Exs. 16, 77.

In his first letter, dated February 18, 2021, Dr. Durham wrote, "[Petitioner] had a flu shot in fall of 2018 and shortly thereafter developed [PMR]. I had several other patients that year have similar autoimmune disorders start after the flu shot. I do suspect it was induced by the flu shot in [Petitioner]." Pet. Ex. 16 at 1.

In his second letter, authored July 19, 2023, Dr. Durham addressed Petitioner's diagnosis and synovitis. Pet. Ex. 77 at 2. Dr. Durham first noted he had treated Petitioner for "several years." Id. Dr. Durham explained that he was the first provider to diagnose Petitioner with PMR and that Petitioner had both "one of the severest cases" of PMR as well as "one of the most resistant cases to treatment." Id. Petitioner initially "progressed and did well with standard PMR therapy;" however, Petitioner relapsed. Id. "Since he has been resistant to standard therapy[,] the rheumatologist started to try other medications and involved other differential diagnoses." Id.

Finally, Dr. Durham opined that Petitioner's diagnosis was PMR "and synovitis from that." Pet. Ex. 77 at 2. In his letter, Dr. Durham provided an abstract of one medical article, from Healy and Sheets,[19] in support of this opinion. Id. According to the abstract, the authors followed 64 patients with RA for three years. Id. Thirty-three patients had RF and 31 patients did not. Id. Twenty-five seronegative patients had an excellent response to low dose prednisone and did not require any additional medication and six of these patients also had an episode diagnosed as PMR. Id. The authors concluded that these findings "suggest that the synovitis currently diagnosed as seronegative RA in many older patients may not be the same disease as seropositive RA, but may be more closely related to or identical with PMR." Id.

### C.    Expert Reports

#### 1.    Petitioner's Expert, M. Eric Gershwin, M.D.[20]

##### a.    Background and Qualifications

Dr. Gershwin is a Distinguished Professor of Medicine in the Division of Rheumatology, Allergy, and Clinical Immunology at the University of California, Davis School of Medicine. Pet. Ex. 90 at 1. He is board certified in internal medicine, rheumatology, and allergy and clinical immunology. Id. at 2. He completed his M.D. at Stanford University after which he completed an internship and residency in internal medicine at Tufts New England Medical Center and trained in immunology at the National Institutes of Health in Maryland. Id. at 1-2. Dr. Gershwin testified he has "extensive experience" diagnosing and treating patients with PMR and RA. Tr. 13. Dr. Gershwin has primarily focused his research on autoimmunity. Tr. 9. Additionally, Dr. Gershwin has held various editor and reviewer positions on medical journals, and he has authored or coauthored over 1,000 publications during his career with a "major focus" on immunology and autoimmunity. Tr. 12; Pet. Ex. 90 at 5-143. Dr. Gershwin was offered and admitted as an expert in rheumatology and immunology without objection. Tr. 13.

##### b.    Opinion

###### i.    Diagnosis

Dr. Gershwin opined Petitioner suffered from PMR in addition to pre-existing "significant" osteoarthritis. Pet. Ex. 18 at 2; Pet. Ex. 72 at 1; Pet. Ex. 79 at 3; Tr. 15. He disagreed that Petitioner suffered from seronegative RA. Tr. 15. Dr. Gershwin further opined that Petitioner did not meet the diagnostic criteria for seronegative RA. Pet. Ex. 79 at 3.

---

[19] L.A. Healy & P.K. Sheets, The Relation of Polymyalgia Rheumatica to Rheumatoid Arthritis, 15 J. Rheumtol. 750 (1988), https://pubmed.ncbi.nlm.nih.gov/3262751/. The full article was not filed.

[20] Dr. Gershwin submitted four expert reports and testified at the hearing. Pet. Exs. 18, 72, 79, 81; Tr. 6-90, 180-91.

Dr. Gershwin acknowledged that PMR and seronegative RA have "considerable overlap." Pet. Ex. 72 at 1. He provided a lengthy excerpt from Manzo and Emamifar[21] that compared the two diseases:

> [PMR] and seronegative elderly-onset [RA] are two of the most frequent inflammatory rheumatologic diseases in elderly patients. At first presentation, there are many similarities between PMR and [seronegative elderly-onset RA], that may lead to a real diagnostic conundrum. . . . In addition to the acute involvement of the shoulder joints, important features characterizing both diseases are morning stiffness longer than 45 minutes, raised [ESR], and a good response to low doses of prednisone. Some findings (such as erosive arthritis or symmetrical involvement of metacarpophalangeal [("MCP")[22]] and/or proximal interphalangeal [("PIP")[23]] joints) can help to make the diagnosis of [seronegative elderly-onset RA] . . . . However, in several patients only long-term follow-ups confirm the initial diagnosis. A definite diagnosis of PMR or [seronegative elderly-onset RA] has significant therapeutic implications, since patients with PMR should be treated with long-term glucocorticoids, and sometimes throughout life, which predisposes the patients to serious side effects. On the contrary, in patients with [seronegative elderly-onset RA], short-term treatment with glucocorticoids should be considered when initiating or changing [DMARDs], followed by rapid tapering.

Id. (quoting Pet. Ex. 73 at 1). Dr. Gershwin opined that while PMR and seronegative RA may appear similar at onset, "over time the distinctions become clearer." Pet. Ex. 79 at 1. Here, he opined, Petitioner had an "abrupt onset of symptoms classical for PMR" with subsequent imaging and examination not consistent with seronegative RA. Id.

---

[21] Ciro Manzo & Amir Emamifar, Polymyalgia Rheumatica and Seronegative Elderly-Onset Rheumatoid Arthritis: Two Different Diseases with Many Similarities, 4 Eur. Med. J. 111 (2019). This was also filed as Resp. Ex. B, Tab 1.

[22] MCP joints (commonly referred to as knuckles) are the "joints formed between the heads of the five metacarpal bones and the bases of the corresponding proximal phalanges." Articulationes Metacarpophalangeae, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=69745 (last visited May 29, 2026); see also Knuckle, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=27154 (last visited June 4, 2026).

[23] A PIP joint is "the interphalangeal joint located proximally on any digit." Proximal Interphalangeal Joint, Dorland's Med. Dictionary Online, https://www.dorlands online.com/dorland/definition?id=69745 (last visited May 29, 2026). In layman's terms, the PIP joints are located just above the knuckles.

In his third report, Dr. Gershwin provided the European Alliance of Associations for Rheumatology ("EULAR")/ American College of Rheumatology ("ACR") provisional classification criteria for PMR:

**Table 6**  PMR classification criteria scoring algorithm—required criteria: age 50 years or older, bilateral shoulder aching and abnormal CRP and/or ESR*

|  | Points without US (0–6) | Points with US† (0–8) |
| --- | --- | --- |
| Morning stiffness duration >45 min | 2 | 2 |
| Hip pain or limited range of motion | 1 | 1 |
| Absence of RF or ACPA | 2 | 2 |
| Absence of other joint involvement | 1 | 1 |
| At least one shoulder with subdeltoid bursitis and/or biceps tenosynovitis and/or glenohumeral synovitis (either posterior or axillary) and at least one hip with synovitis and/or trochanteric bursitis | Not applicable | 1 |
| Both shoulders with subdeltoid bursitis, biceps tenosynovitis or glenohumeral synovitis | Not applicable | 1 |

*A score of 4 or more is categorised as PMR in the algorithm without US and a score of 5 or more is categorised as PMR in the algorithm with US.
†Optional ultrasound criteria.
ACPA, anticitrullinated protein antibody; CRP, C-reactive protein; ESR, erythrocyte sedimentation rate; PMR, polymyalgia rheumatica; RF, rheumatoid factor; US, ultrasound.

Pet. Ex. 79 at 3 (citing Pet. Ex. 82 at 6 tbl. 6).[24]  The authors of the classification criteria concluded "patients aged 50 years or older presenting with bilateral shoulder pain and elevated CRP and/or ESR can be classified as having PMR in the presence of morning stiffness for more than 45 min, and new hip pain in the absence of peripheral synovitis or positive RA serology." Pet. Ex. 82 at 8.  They also noted that PMR and RA could not be distinguished based on ultrasound.  Id. at 6.

Applying the PMR classification criteria, Dr. Gershwin opined that Petitioner met the first three criteria and could not meet the last two criteria because he did not have an ultrasound of his shoulders or hips.  Pet. Ex. 79 at 1.  Dr. Gershwin concluded "based on the first three criteria alone[,] [] he [was] correctly diagnosed with PMR."  Id.

Next, Dr. Gershwin opined that Petitioner's medical records and treating providers supported diagnoses of PMR and osteoarthritis.  Pet. Ex. 79 at 1.  In his testimony, Dr. Gershwin reviewed Petitioner's initial visits to his PCP and rheumatologist following the vaccination at issue.  Tr. 18-20.  At his December 18, 2018 visit, Petitioner reported acute onset of joint pain and stiffness, including weakness of his shoulder and hip, with some pain.  Tr. 18 (citing Pet. Ex. 4 at 44).  Petitioner reported that when he woke up, he could hardly move for about 45 minutes, and all of his prior injuries were stiff.  Id.  Further, he had elevated ESR and Petitioner was started on prednisone.  Tr. 19.  Dr. Gershwin noted he was assessed with PMR one week later during a follow-up visit.  Id.

---

[24] Bhaskar Dasgupta et al., 2012 Provisional Classification Criteria for Polymyalgia Rheumatica: A European League Against Rheumatism/ American College of Rheumatology Collaborative Initiative, 71 Ann. Rheum. Dis. 484 (2012).

15

Petitioner was next seen at a rheumatology office.  Tr. 20.  Petitioner reported joint pain as well as stiffness, "particularly in his hip, hands[,] and shoulders."  Id.  Dr. Gershwin opined that Petitioner's complaints at this visit suggested PMR and osteoarthritis.  Tr. 20-21.  Of note, Petitioner's physical examination did not document any joint swelling.  Tr. 21.  Dr. Gershwin testified that Petitioner was experiencing arthralgias (pain in the joints) and tenderness.  Id.  And Dr. Gershwin emphasized that there was a difference between arthralgias and pain in the joints secondary to arthritis.  Id.  Dr. Gershwin noted pain in joints due to arthritis involved inflammation of the joints and was "characterized not only by pain but by swelling, by redness or erythema, heat, and loss of function," while arthralgias and tenderness "could be consistent with longstanding osteoarthritis" and PMR.  Id.

At Petitioner's next PCP appointment, on January 23, 2019, he reported flares of symptoms when he reduced his prednisone dose.  Tr. 21-22 (citing Pet. Ex. 4 at 34).  Dr. Gershwin opined this was not unusual and was consistent with PMR and treatment with steroids.  Tr. 22.  At his next rheumatology appointment on January 28, 2019, Petitioner was diagnosed with atypical PMR based on the presence of continued symptoms while taking prednisone.  Id. (citing Pet. Ex. 3 at 11).  Dr. Gershwin also noted that Petitioner's ESR had fallen to 23 (ESR upper limit is 20) and his CRP had normalized.  Id.  Accordingly, Dr. Gershwin opined that Petitioner's "biggest problem" at this visit, and subsequent visits, was "pretty significant osteoarthritis."  Id.

An ultrasound was then taken that showed synovitis.  Tr. 23 (citing Pet. Ex. 9 at 29).  Dr. Gershwin opined that synovitis is seen in osteoarthritis as well as RA.  Tr. 22.  He explained that Bouchard's and Heberden's nodes, while "not themselves inflammatory, . . . can irritate and produce synovitis in the tissue underneath it."  Tr. 23.  Dr. Gershwin testified that the ultrasound of Petitioner's hands was "characteristic of osteoarthritis."  Id.

On April 2, 2019, Petitioner was seen by rheumatologist Dr. Palfrey for the first time.  Tr. 23-24 (citing Pet. Ex. 3 at 18).  Dr. Gershwin noted inflammatory markers had improved.  Tr. 24.  At this visit, Petitioner was assessed with PMR and "inflammatory polyarthropathy."  Id.  Dr. Gershwin opined that inflammatory polyarthropathy could "refer to the possibility that maybe there's a consideration of [RA]."  Id.  Dr. Gershwin also noted that "polyarthritis" was a broad term that included diffuse osteoarthritis.  Id.

Reviewing Petitioner's rheumatology visits between 2019 and 2024, Dr. Gershwin testified that treating providers maintained diagnoses of PMR and osteoarthritis.  Tr. 32.  He further testified that Petitioner's PMR was "controlled" and Petitioner's predominate symptoms were due to osteoarthritis.  Tr. 90.

Dr. Gershwin noted that Petitioner's inflammatory markers, specifically his ESR and CRP, had normalized by June 2019 and, thereafter, remained at normal levels.  Tr. 24-25, 27.  He explained that normal inflammatory markers are consistent with "controlled" PMR.  Tr. 32.  Additionally, Dr. Gershwin testified that ongoing elevated ESR and CRP would be expected if Petitioner was experiencing RA.  Tr. 27.

16

Dr. Gershwin emphasized Petitioner's pre-vaccination history of "pretty significant osteoarthritis" in the knees, history of low back pain, and the presence of Heberden's and Bouchard's nodes in his hands, which are "bony protrusions . . . indicative of osteoarthritis."  Tr. 15.  Dr. Gershwin attributed these conditions to Petitioner's work in construction.  Tr. 15-16.

Next, Dr. Gershwin opined that Petitioner's treatment with steroid and steroid sparing agents was consistent with treatment for PMR.  Pet. Ex. 79 at 1.  He explained that treatment for seronegative RA would "most likely involve highly specific biologic medications."  Id.  Dr. Gershwin acknowledged Petitioner was prescribed Plaquenil followed by leflunomide, meloxicam, and sulfasalazine.  Tr. 31-33.  He testified that Plaquenil can be used in the treatment of PMR; however, he noted it was "mostly used" to treat Sjögren's syndrome and RA.  Tr. 31. He also acknowledged leflunomide is "primarily used" to treat RA, but opined that leflunomide could be used as a "steroid-reducing agent" for patients with PMR.  Tr. 32-33.  He further testified that Petitioner did not need to be prescribed leflunomide for his condition.  Tr. 33.  In his rebuttal testimony, Dr. Gershwin conceded that he would not use the DMARDs prescribed for Petitioner in the treatment of PMR in his own practice.  Tr. 183.  However, Dr. Gershwin maintained that the DMARDs prescribed for Petitioner can be used to treat PMR.  Id.

Addressing seronegative RA, Dr. Gershwin opined Petitioner's examinations and imaging results were not consistent with seronegative RA.  Pet. Ex. 79 at 1.  Further, Petitioner did not have "persistent swelling, fluid buildup, or radiographic changes typical of RA."  Id. at 2. In support, Dr. Gershwin provided the 1987 revised criteria for the classification of RA.  Id. at 2 tbl. 1 (quoting Pet. Ex. 80 at 5 tbl. 5).[25]

---

[25] F.C. Arnett et al., The American Rheumatism Association 1987 Revised Criteria for the Classification of Rheumatoid Arthritis, 31 Arthritis Rheum. 315 (1988).

Table 1. The 1987 revised criteria for the classification of rheumatoid arthritis (traditional format)*(1)

| Criterion | Definition |
|---|---|
| 1. Morning stiffness | Morning stiffness in and around the joints, lasting at least 1 hour before maximal improvement |
| 2. Arthritis of 3 or more joint areas | At least 3 joint areas simultaneously have had soft tissue swelling or fluid (not bony overgrowth alone) observed by a physician. The 14 possible areas are right or left PIP, MCP, wrist, elbow, knee, ankle, and MTP joints. |
| 3. Arthritis of hand joints | At least 1 area swollen (as defined above) in a wrist, MCP, or PIP joint |
| 4. Symmetric arthritis | Simultaneous involvement of the same joint areas (as defined in 2) on both sides of the body (bilateral involvement of PIPs, MCPs, or MTPs is acceptable without absolute symmetry. |
| 5. Rheumatoid nodules | Subcutaneous nodules, over bony prominences, or extensor surfaces, or in juxtaarticular regions, observed by a physician |
| 6. Serum rheumatoid factor | Demonstration of abnormal amounts of serum rheumatoid factor by any method for which the result has been positive in <5% of normal control subjects |
| 7. Radiographic changes | Radiographic changes typical of rheumatoid arthritis on posteroanterior hand and wrist radiographs, which must include erosions or unequivocal bony decalcification localized in or most marked adjacent to the involved joints (osteoarthritis changes alone do not qualify) |

*For classification purposes, a patient shall be said to have rheumatoid arthritis if he/she has satisfied at least 4 of these 7 criteria. Criteria 1 through 4 must have been present for at least 6 weeks. Patients with 2 clinical diagnoses are not excluded. Designation as classic, definite, or probable rheumatoid arthritis is *not* to be made.

Id.  Applying the 1987 classification criteria, Dr. Gershwin first noted Petitioner did not have morning stiffness typical of RA.  Tr. 36.  Next, he opined Petitioner did not have arthritis in three or more joints.[26]  Id.  He agreed that Petitioner experienced arthralgias; however, Dr. Gershwin explained Petitioner did not have swollen hand joints and there was "no evidence of inflammatory joints."  Tr. 37-38.  Dr. Gershwin explained RA involves "chronic persistent synovitis and multiple swollen joints."  Pet. Ex. 79 at 1.  And he opined Petitioner's "numerous physical examinations are not consistent with RA."  Id.  Instead, Petitioner had subjective complaints of arthralgias, consistent with PMR, and stiffness, consistent with osteoarthritis.  Id.  As discussed above, Dr. Gershwin opined Petitioner's ultrasound was consistent with osteoarthritis rather than RA.  Tr. 37.  Additionally, Dr. Gershwin noted that Petitioner's complaints were sometimes asymmetric while most people have symmetric symptoms with RA.  Id.  Finally, Dr. Gershwin noted that Petitioner's hip and knee X-rays showed osteoarthritis and were never interpreted as consistent with RA.  Id.

Dr. Gershwin testified that the revised 1987 and 2010 RA classification criteria were not substantively or meaningfully different.  Tr. 36.  The 2010 classification criteria for RA uses a composite scoring system based on the number and site of affected joints; presence and level of

---

[26] Dr. Gershwin explained that arthritis is not the same as "bony overgrowth" like Heberden's and Bouchard's nodes, but instead referred to actual joints that were swollen, for example in the wrist, MCP joints, or PIP joints.  Tr. 36-37.

anti-citrullinated peptide ("anti-CCP") antibodies[27] and RF; the presence of acute phase reactants, ESR, and CRP; and the duration of symptoms for more than six weeks.  Tr. 39-40.

**2010 Classification Criteria for Rheumatoid Arthritis.**

| Criteria[a,b] | Score |
|---|---|
| **A.  Joint Involvement** | |
| 1 large joint | 0 |
| 2-10 large joints | 1 |
| 1-3 small joints | 3 |
| >10 joints (at least 1 small joint) | 4 |
| **B.  Serology** | |
| Negative RF and anti-CCP | 0 |
| Low-positive RF or anti-CCP | 2 |
| High-positive RF or anti-CCP | 3 |
| **C.  Acute-phase reactants** | |
| Normal CRP and ESR | 0 |
| Abnormal CRP or ESR | 1 |
| **D.  Duration of Symptoms** | |
| <6 weeks | 0 |
| ≥6 weeks | 1 |

a.  Criteria apply only to patients who have objective signs of synovitis in at least 1 joint and who do not have a better alternative explanation for synovitis.
b.  A patient is classified as having rheumatoid arthritis if the sum of A-D is >6.

Resp. Ex. A, Tab 6 at 14 tbl. 15-4.[28]  Dr. Gershwin opined that Petitioner also did not satisfy the 2010 classification criteria.  Tr. 40.  He emphasized that the 2010 criteria only apply to "patients who have objective evidence of synovitis in at least one joint, and who do not have a better alternative explanation for synovitis."  Id. (quoting Resp. Ex. A, Tab 6 at 14).  While Petitioner's ultrasound showed synovitis, Dr. Gershwin again opined Petitioner's synovitis was consistent with osteoarthritis.  Tr. 39.  Thus, he opined that Petitioner did not have RA under the 2010 criteria.  Tr. 40.

---

[27] Anti-CCP antibodies are antibodies against cyclic citrullinated peptide, "a synthetic, citrulline-containing peptide with a cyclic structure," that are "highly specific for [RA]."  Anti-CCP Antibody, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56787 (last visited May 29, 2026); Cyclic Citrullinated Peptide, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=97140 (last visited May 29, 2026).

[28] James R. O'Dell et al., Rheumatoid Arthritis, in Current Diagnosis & Treatment: Rheumatology (John B. Imboden et al. eds., 3rd ed. 2013).

Responding to Dr. Matloubian's testimony, Dr. Gershwin opined that Petitioner's ankle and feet symptoms were attributable to osteoarthritis. Tr. 184. Dr. Gershwin acknowledged that no X-rays were taken of Petitioner's ankle; however, given Petitioner's work in construction and significant pre-existing osteoarthritis, Dr. Gershwin expected osteoarthritis in the ankles. Id. Dr. Gershwin also opined that DAS28 score may be used by practitioners to measure pain and discomfort in patients with osteoarthritis. Tr. 182-83.

Finally, Dr. Gershwin asserted that Petitioner's treating providers did not ever abandon the diagnosis of PMR or indicate that his diagnosis evolved or changed to RA. Pet. Ex. 79 at 3. He attributed the inclusion of a "non-specific inflammatory polyarthropathy in [Petitioner's] differential diagnosis" to an ultrasound of Petitioner's hands done in January 2019 that showed mild to moderate synovitis. Id. at 1. Dr. Gershwin did not address the records from 2024, where Petitioner's treating rheumatologist documented a "[w]orking diagnosis of seronegative inflammatory arthritis/[RA]." See Pet. Ex. 85 at 29.

## ii.    **Althen Prong One**

Broadly, Dr. Gershwin opined that PMR can be caused by the flu vaccine triggering a local inflammatory response, followed by a systemic response in a genetically susceptible individual. See, e.g., Pet. Ex. 18 at 2-4; Pet. Ex. 72 at 2-3; Tr. 40-63. Dr. Gershwin's immunological theory implicated the innate immune system and adaptive immune system, autoinflammatory and autoimmune principles, and components of genetics and immune dysregulation (immunosenescence). See id.

In his first report, Dr. Gershwin analogized the pathogenesis of PMR to temporal arteritis (i.e., giant cell arteritis ("GCA"))[29] and observed the diseases were "closely related." Pet. Ex. 18 at 2. Dr. Gershwin opined there was "significant clinical and epidemiologic overlap" between

---

[29] GCA, also known as temporal arteritis, is a "chronic vascular disease in the elderly, of unknown origin, often associated with [PMR], seen usually in the external carotid arteries but sometimes in other arteries. Characteristics include proliferative inflammation, often with giant cells and granulomas; headache; pain with chewing; weight loss; fever; sometimes ocular symptoms; and increased [ESR]." Giant Cell Arteritis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=58337 (last visited May 29, 2026); Temporal Arteritis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=58348 (last visited May 29, 2026).

PMR and GCA.  Id.  He noted both diseases were associated with the HLA-DRB1 gene.[30]  Id. (citing Pet. Ex. 20;[31] Pet. Ex. 21).[32]  While Dr. Gershwin opined PMR is "considered a vasculitis-related event," he explained PMR is "not considered a classic vasculitis."  Id.

Next, Dr. Gershwin provided a lengthy excerpt discussing the role of T cells,[33] natural killer ("NK") cells,[34] and B cells[35] in the pathogenesis of both PMR and GCA.  Pet. Ex. 18 at 2-3

---

[30] HLA, or human leukocyte antigens, are "histocompatibility antigens governed by genes of the HLA complex (the human major histocompatibility complex), a region on the short arm of chromosome 6 containing several genetic loci, each having multiple alleles."  Human Leukocyte Antigens, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition?id=56923 (last visited May 29, 2026).  HLA-DR loci "are [] associated with antigenic determinants on class II antigen molecules," which are "major histocompatibility antigens found only on immunocompetent cells, primarily B lymphocytes and macrophages; they are found on molecules consisting of two noncovalently bound chains."  Class II Antigens, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56885 (last visited May 29, 2026).

[31] Cornelia M. Weyand et al., The HLA-DRB1 Locus as a Genetic Component of Giant Cell Arteritis, 90 J. Clin. Invest. 2355 (1992).

[32] E. Liozon et al., Familial Aggregation in Giant Cell Arteritis and Polymyalgia Rheumatica: A Comprehensive Literature Review Including 4 New Families, 27 Clin. & Exp. Rheumatol. S89 (2009).

[33] T cells, also known as T lymphocytes, are "the cells primarily responsible for cell-mediated immunity; they originate from lymphoid stem cells that migrate from the bone marrow to the thymus and differentiate under the influence of the thymic hormones . . . .  They are characterized by specific surface antigens . . . .  When activated by antigen, T lymphocytes proliferate and differentiate into T memory cells and the various types of regulatory and effector T cells."  T Lymphocytes, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/ dorland/definition?id=87562 (last visited May 29, 2026).

[34] NK cells are "cells capable of mediating cytotoxic reactions without prior sensitization against the target.  NK cells are small lymphocytes without B- or T-cell surface markers that originate in the bone marrow and develop fully in the absence of the thymus; their cytotoxic activity is not antibody-dependent."  NK Cells, Dorland's Med. Dictionary Online, https://www.dorlands online.com/dorland/definition?id=64294 (last visited May 29, 2026).

[35] B cells, also known as B lymphocytes, are "the cells primarily responsible for humoral immunity, the precursors of antibody-producing cells (plasma cells). . . .  When stimulated by antigen, a process that requires the cooperation of helper T cells and macrophages, B lymphocytes proliferate and differentiate into plasma cells and memory B cells."  B Lymphocytes, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition?id=87550 (last visited May 29, 2026).

(citing Pet. Ex. 47 at 2).[36]  He opined that involvement of T cells, NK cells, and B cells in the pathogenesis of PMR indicated a "enhanced/increased pro-inflammatory response" that is "driven by antigen."  Id.; see also Tr. 62-63.

Dr. Gershwin next opined that Petitioner's vaccine-induced PMR was "consistent with a cytokine-driven process by [] innate or first responder immune cells."  Pet. Ex. 18 at 4.  In his first report, he specifically explained that

> [i]n response to the flu vaccination, there is migration of the vaccine antigen to regional lymph nodes where it is processed by professional antigen presenting cells.  This process includes production of cytokines by first responder cells.  However, as in other patients with PMR, the effect of first responder cells[] is on the articular tissue and muscles.  There is an enormous diversity of the human immune response that makes events probable, although rare.

Id.

Further, Dr. Gershwin invoked immunosenescence (i.e., aged-related changes in immunity) and genetic susceptibility as relevant to the development of PMR following vaccination.  Pet. Ex. 18 at 3-4.  Dr. Gershwin asserted there "is an enormous degree of genetic variation in the immune response."  Id. at 3.  He then discussed studies of the genetic basis of immune activation following wild-type measles vaccination in healthy individuals.  Id. at 4.  Petitioner did not receive a measles vaccine.

At the hearing, Dr. Gershwin focused his opinions on cytokines.  He explained that his theory of causation is "a cytokine response to the flu vaccine in a genetic susceptible host with immune dysregulation, immunosenescence," that "exerts an inflammatory response on an already dysregulated immune system, causes the redistribution of cells . . . towards an inflammatory bias, including [interleukin ("IL")]-6, which produces . . . the pain and discomfort, and the inflammation" seen in PMR.  Tr. 60.

In support, Dr. Gershwin discussed a paper by van der Geest et al.[37] that explained B cells produce the cytokine IL-6 and contribute to the enhanced IL-6 responses in PMR/GCA.  Tr. 58-59 (citing Pet. Ex. 51 at 1).  He testified that B cells play a role in the "redistribution of cells" toward "an inflammatory bias" which causes pain, discomfort, and inflammation in PMR.  Tr. 60-61.  In van der Geest et al., the authors concluded "B cells likely contribute to the enhanced IL-6 response of patients with GCA or PMR."  Pet. Ex. 51 at 10.  However, the authors of van der Geest et al. did not conclude that cytokines or enhanced IL-6 causes PMR.  See id.; see also

---

[36] Miguel Gonzalez-Gay & Trinitario Pina, Giant Cell Arteritis and Polymyalgia Rheumatica: An Update, 17 Curr. Rheuatol. Rep. 1 (2015).

[37] Kornelis S.M. van der Geest et al., Disturbed B Cell Homeostasis in Newly Diagnosed Giant Cell Arteritis and Polymyalgia Rheumatica, 66 Arthritis & Rheumatol. 1927 (2014).

Pet. Ex. 75 (regarding the role of IL-6 in PMR/GCA).[38]  Instead, the authors discussed the role of B cells in PMR pathogenesis and explained B cells produce "not only antibodies, but also cytokines that modulate immune responses."  Pet. Ex. 51 at 10.  The primary finding of the study was that "the homeostasis of B cells is highly disturbed in patients with GCA and PMR."  Id. Based on the findings, the authors suggested that "the distribution of B cells is highly disturbed in GCA and PMR," and "that B cells likely contribute to the enhanced IL-6 response in both diseases."  Id.

Additionally, Dr. Gershwin provided several case reports of PMR and/or GCA following vaccination.  Pet. Ex. 18 at 2; Tr. 66-69; see also Pet. Exs. 34-44, 46.[39]

Brown and Bertough,[40] an older article published in 1994, described three patients, including one who developed PMR after vaccination (the other two patients were diagnosed with systemic lupus and RA).  Pet. Ex. 34 at 1.  The PMR patient developed symptoms three weeks after flu vaccination.  Id.  He began treatment with prednisone, which was later weaned and discontinued, and his condition resolved within nine months.  Id.  The authors did not offer a causal theory to explain how the flu vaccine could cause this reaction, and they did not discuss cytokines.

Soriano et al.[41] described 10 female patients who developed PMR/GCA, or both, following flu vaccination in Italy.  Pet. Ex. 43 at 2, 2 tbl. 1.  Two were diagnosed with PMR.  Id. One patient developed PMR one month after flu vaccination, while another patient had onset two months after flu vaccination and experienced a PMR relapse two weeks after a subsequent flu vaccination two years later.  Id.  Regarding causal mechanisms, the authors discussed adjuvants as potential "triggers of autoimmunity" and suggested that adjuvants could be "a possible expression" of autoimmunity/inflammatory syndrome induced by adjuvants ("ASIA").  Id. at 1,

---

[38] Éric Toussirot et al., Interleukin-6: A Promising Target for the Treatment of Polymyalgia Rheumatica or Giant Cell Arteritis?, 2 RMD Open e000305 (2016).

[39] Two papers are in in other languages (French and German) and only one has an abstract in English.  See Pet. Ex. 42 (D. Saadoun, Vascularites Postvaccinales: À Propos de Trois Observations, 22 Rev. Méd. Interne 172 (2001)); Pet. Ex. 36 (H.J. Gerth, Polymyalgia Rheumatica and Influenza Vaccination, 117 Dtsch. Med. Womchenschrift 1259 (1992).  Because full text articles were not provided, the undersigned is unable to review or verify the information contained therein and therefore does not discuss the articles.

[40] M.A. Brown & J.V. Bertouch, Rheumatic Complications of Influenza Vaccination, 24 Aust. NZ J. Med. 572 (1994).

[41] A. Soriano et al., Giant Cell Arteritis and Polymyalgia Rheumatica After Influenza Vaccination: Report of 10 Cases and Review of Literature, 21 Lupus 153 (2012).  Of note, Soriano et al. also provided a table of cases reported in the literature.  See Pet. Ex. 43 at 4 tbl. 2. Some of the papers identified have been filed in this case and are discussed herein.

4.  A theory based on adjuvants lacks foundational relevance here, since there is no evidence that the flu vaccine at issue contained an adjuvant.

Liozon et al.[42] described a 91-year-old-women who developed PMR approximately two weeks after flu vaccination.  Pet. Ex. 38 at 2.  She developed high fever, chills, rash, and fatigue the day after flu vaccination (her first flu vaccine).  Id.  Also, she had a positive urine culture and was treated with antibiotics.  Id.  She continued to have fever, and 13 days after vaccination developed muscle pain, joint stiffness, and reduced range of motion and "pulsatile temporal arteries."  Id.  Inflammatory markers ESR and CRP were elevated.  Id.  She was diagnosed with PMR and treated with prednisone, which was later successfully tapered.  Id.  The mechanism proposed was an "interaction between vaccine (or egg protein) antigens and native antibodies [which] may have generated immune complexes which led to the vasculitis syndrome."  Id.; see also Pet. Ex. 39 at 12 (reporting on a case of PMR following flu vaccination and theorizing that "antigenic properties of [flu vaccine] (viral or egg protein) interacting with native antibodies might induce an abnormal immune response, generating immunocomplexes that could lead to vessel inflammation").[43]  The authors concluded that the flu vaccine was "possibly" associated with PMR.  Pet. Ex. 38 at 2.

Dr. Gershwin also noted there was a case report of PMR relapse following flu vaccination.  Pet. Ex. 18 at 4 (citing Pet. Ex. 58).[44]  Bassendine and Bridge documented a woman with PMR, described as severe due to a very elevated CRP (141.7 mg/L), who was in remission but suffered a relapse following receipt of a flu vaccine that contained an adjuvant.  Pet. Ex. 58 at 2.  The authors discussed ASIA syndrome, suggesting it may be the causal mechanism.  Id.

Other case reports discussed either GCA or PMR in association with GCA.  For example, Wada et al.[45] reported the case of a previously healthy 70-year-old women who developed GCA with PMR one day after flu vaccination.  Pet. Ex. 44 at 3; see also Pet. Ex. 35 (reporting a case of GCA five days after flu vaccination);[46] Pet. Ex. 40 (reporting a case of GCA three weeks after

---

[42] Eric Liozon et al., Polymyalgia Rheumatica Following Influenza Vaccination, 48 J. Am. Geriatr. Soc. 1533 (2000).

[43] Juan Marti & Enrique Anton, Polymyalgia Rheumatica Following Influenza Vaccination, 52 J. Am. Geriatr. Soc. 1412 (2004).

[44] Margaret Bassendine & Simon Bridge, Relapse of Polymyalgia Rheumatica Following Adjuvanted Influenza Vaccine: A Case-Based Review, 7 Eur. J. Rheumatol. 37 (2020).

[45] Makoto Wada et al., Giant Cell Arteritis with Polymyalgia Rheumatica Associated with Influenza Vaccination, 38 J. Dermatol. 1099 (2011).

[46] J. Finster et al., Cavernous Sinus Syndrome Due to Vaccine-Induced Giant Cell Arteritis, 161 Arch. Inter. Med. 1009 (2001).

flu vaccination);[47] Pet. Ex. 37 at 3-4 (discussing an "abrupt onset" of GCA two weeks after flu vaccine and noting the association was "possibly coincidental").[48]  Additionally, Mader et al.[49] reported on three cases of systemic vasculitis following flu vaccination.  Pet. Ex. 46 at 1.

Additionally, Dr. Gershwin reported that in a "large series of nearly 1,800 adverse events, PMR was found in 9.2% of patients."  Pet. Ex. 18 at 3 (citing Pet. Ex. 57).[50]  Felicetti et al. provided an overview of vasculitis as an adverse event reported in three databases, including the Vaccine Adverse Event Reporting System ("VAERS").[51]  Pet. Ex. 57 at 1.  Reports of vasculitis following vaccinations (not limited to flu vaccinations) between 2003 and 2014 were reviewed. Id.  Just more than half of the reports were in children.  Id. at 2-3.  The most common types of vasculitis reported were Henock-Schoenlein Purpura and Kawasaki Disease, reported at 19.1% and 16.1%, respectively.  Id. at 3.  PMR made up 9.2% of the reports.  Id.

Next, Dr. Gershwin discussed a retrospective study from Falsetti et al.[52]  Pet. Ex. 18 at 4 (citing Pet. Ex. 59); Tr. 68-69.  The authors reviewed 58 cases of PMR from a single rheumatology care setting in Italy between 2003 and 2017.  Pet. Ex. 59 at 2.  Over the 20-year study period, 15 (26%) patients had a connection with an environmental trigger, including six who had received a vaccine.  Id.  Of these, four received a flu vaccine and two received tetanus toxoid vaccines.  Id. at 3.  The authors suggested immunosenescence and "genetic polymorphisms" could explain the link between vaccination and PMR/GCA.  Id. at 2.  The authors also referenced "innate immune dysregulation in the elderly, with excessive and prolonged production of pro-inflammatory cytokines."  Id.  They concluded that given "the

---

[47] Carlos Perez et al., Giant Cell Arteritis After Influenza Vaccination, 160 Arch. Intern. Med. 2677 (2000).

[48] Manash K. Ghose et al., Arteritis of the Aged (Giant Cell Arteritis) and Fever of Unexplained Origin, 60 Am. J. Med. 429 (1976).

[49] Reuven Mader et al., Systemic Vasculitis Following Influenza Vaccination: Report of 3 Cases and Literature Review, 20 J. Rheumatol. 1429 (1993).

[50] Patrizia Felicetti et al., Spontaneous Reports of Vasculitis As an Adverse Event Following Immunization: A Descriptive Analysis Across Three International Databases, 34 Vaccine 6634 (2016).

[51] The Vaccine Adverse Event Reporting System, or VAERS, is "a national early warning system to detect possible safety problems in U.S.-licensed vaccines. . . . .  VAERS is a passive reporting system . . . [and] is not designed to determine if a vaccine caused a health problem, but is especially useful for detecting unusual or unexpected patterns of adverse event reporting that might indicate a possible safety problem with a vaccine."  About VAERS, U.S. Dep't Health & Hum. Servs., https://vaers.hhs.gov/about.html (last visited May 6, 2026).

[52] Paolo Falsetti et al., Polymyalgia Rheumatica Following Infective Triggers of Vaccinations: A Different Subset of Disease?, 58 Reumatologia 76 (2020).

notably high number of years encompassed by [the] retrospective analysis, a direct correlation with any specific subtype of vaccine, which varies year per year, can be excluded." Id. at 4. The authors recommended further study but concluded that despite progress in the treatment of PMR/GCA, the "etiology remains an intriguing matter of debate." Id.

Addressing epidemiological studies, Dr. Gershwin opined that epidemiologic studies that specifically addressed PMR and flu vaccine "would have to include a sufficient number of subjects in [Petitioner's] age group and have sufficient power to address rare events." Pet. Ex. 18 at 4. Thus, the study would require "a very large patient cohort." Id. In his fourth report, Dr. Gershwin provided a lengthy discussion about power calculations and requisite sample sizes (such as 4,669,012 subjects over the age of 50) necessary for detection of vaccination as a statistically significant "environmental factor that can stimulate . . . PMR." Pet. Ex. 83 at 1-4. He noted that his calculations may be "be overly simplistic because of genetic variation" and he explained "[e]pidemiology is forced to overlook the potential interaction where multiple factors could interact in a non-linear manner to influence the development of PMR." Id. at 6. Further, Dr. Gershwin opined that adverse reactions are underreported at a median rate of 94%. Id. (citing Pet. Ex. 84).[53] A systemic literature search by Hazell and Shakir reviewed 37 studies and found a median underreporting rate of 94% for adverse drug reactions. Pet. Ex. 84 at 1. Of note, the authors investigated adverse drug reactions broadly and did not focus on vaccine reactions. See id.

Finally, Dr. Gershwin provided a study from Oh et al.[54] to support his opinion that there is an increased risk of PMR following flu vaccination. Tr. 63-65 (citing Pet. Ex. 87). Oh et al. collected data on six types of rheumatic diseases (ankylosing spondylitis, PMR, RA, Sjögren's syndrome, systemic lupus erythematosus, and systemic scleroderma) from the World Health Organization International Pharmacovigilance Database between 1967 and 2023, with a total of 131,255,418 reports from 156 countries. Pet. Ex. 87 at 1. They found "vaccines had a significant signal for PMR, Sjögren's syndrome, and systemic scleroderma." Id. at 3. "[Flu], encephalitis, and typhoid vaccines appear[ed] to have signals specifically for PMR." Id. Addressing plausible mechanisms, the authors noted that the "main and well-known pathologic mechanism for new-onset rheumatic diseases associated with various types of vaccines is molecular mimicry of some components of vaccine to self-antigens." Id. at 7. The authors also noted that ASIA had been suggested as a mechanism in vaccines with adjuvants. Id.

Dr. Gershwin explained that Oh et al. used disproportionality analysis to find association between vaccination and adverse events. Tr. 64-65. Specifically, they used an information component ("IC") value. Tr. 64. If an IC value is zero, that means the observed and the expected value are "basically the same." Id. However, if the IC value is greater than zero, it

---

[53] Lorna Hazell & Saad A.W. Shakir, Under-Reporting of Adverse Drug Reactions: A Systematic Review, 29 Drug Safety 385 (2006).

[54] Jiyeon Oh et al., Global Burden of Vaccine-Associated Rheumatic Diseases and Their Related Vaccines, 1967–2023: A Comprehensive Analysis of the International Pharmacovigilance Database, 27 Int. J. Rheumatic Diseases e15294 (2024). A copy of the study with all supplemental data was filed as Resp. Ex. E.

suggests a safety signal.  Id.  An IC value greater than 0.25 is considered statistically significant.  Tr. 65.  Dr. Gershwin agreed that a signal does not prove causality but "it's very indicative of . . . an issue."  Tr. 65.  Dr. Gershwin testified that Oh et al. is "an example" of "a very large series [used] in order to show that there is an association" between vaccination and PMR.  Id.

Looking at the supplemental data for Oh et al., Dr. Gershwin acknowledged that the eight cases of PMR in patients ages zero to 17 included in the study were erroneous.  Tr. 191.  Dr. Gershwin opined that the inclusion of these patients did not change his opinions about the paper.  Id.  Dr. Gershwin emphasized that Oh et al. contained "an enormous number of people" and some error was to be expected.  Tr. 186-87.

### iii.      <u>Althen</u> Prongs Two and Three

Addressing <u>Althen</u> prong two, Dr. Gershwin opined there was a "logical sequence of cause and effect showing the vaccination was the reason for the injury."  Pet. Ex. 18 at 5.  He explained,

> Following a vaccination, there is migration of the vaccine antigen to regional lymph nodes where it is processed by professional antigen presenting cells.  This process includes production of cytokines, recruitment, and activation of both antigen specific and antigenic non-specific immune cells.  Such cells migrate throughout the body as part of the body's systemic ability to protect itself.  Antibodies are produced, such a sequence is normal and part of the vaccination process.  It was not different in the case of [Petitioner] [than] anyone else.  However, it was the abnormal innate immune response that targeted its articular tissue and muscles that was unique to [Petitioner].

Id.  He noted this "abnormal activation occurred" after Petitioner's flu vaccination "without any other antecedent immunological challenges" such as an infection.  Id.  Dr. Gershwin testified that in Petitioner's case, the appearance of inflammatory markers two weeks after vaccination was consistent with an innate immune response involving cytokines.  Tr. 71-72.  Further, Petitioner's "genetic susceptibility" and older age resulted in a "dysregulated inflammatory cytokine response."  Tr. 72.  Dr. Gershwin also noted that Petitioner's PCP opined Petitioner's PMR was caused by flu vaccination.  Tr. 33-34; Pet. Ex. 18 at 5.

While Dr. Gershwin emphasized that PMR contained a genetic component, he acknowledged that genetic testing is not done in patients with PMR.  Tr. 57.  Additionally, Dr. Gershwin acknowledged that Petitioner received flu vaccinations in 2015, 2016, and 2017 without adverse effects.  Tr. 87.  In response, he testified that "immunosenescence is not static," meaning an immune response may be "very different" when a person is 60 as compared 64 years old.  Tr. 73.

Turning to <u>Althen</u> prong three, Dr. Gershwin opined that Petitioner did not have symptoms of PMR prior to vaccination.  Pet. Ex. 18 at 5.  In his first report, he noted that Petitioner presented to an orthopedic surgeon on November 29, 2018, less than two weeks after vaccination, due to increasing pain in the right knee.  Id. at 2.  Examination revealed

inflammation of the knee and blood work showed elevated CRP and ESR.  Id.  Petitioner had increased stiffness over the next month, with weakness in the shoulder and hip, which, along with the increased inflammatory markers led to the diagnosis of PMR.  Id.  Dr. Gershwin opined that the "kinetics of appearance of his complaints slightly less than two weeks later are consistent with a normal timing of an immune response following a vaccination."  Id. at 5.

Addressing the timing of innate immune responses, Dr. Gershwin explained that cytokine production, specifically IL-6, occurs "almost immediately and should reach its peak within [five to seven] days of vaccination in a normal host."  Pet. Ex. 18 at 3.  "If it is part of the adaptive immune response, then IL-6 will be produced in a period beginning particularly with a secondary [immunoglobulin] G response, or a period of [three to five] days to up to [six] weeks following the vaccination."  Id.

At the hearing, based on Petitioner's symptoms, Dr. Gershwin placed onset on December 17, 2018, 31 days after vaccination.  Tr. 72.  However, Dr. Gershwin testified that Petitioner's bloodwork demonstrated an inflammatory response, of elevated ESR and CRP, 13 days after vaccination.  Tr. 73-74.  Petitioner had "onset of surrogate markers of inflammation before symptoms."  Tr. 53.  Dr. Gershwin suggested that the inflammatory markers (elevated CRP and ESR) indicated his disease process started "a little bit before" the symptoms of PMR.  Tr. 53-54.  Dr. Gershwin concluded that onset of clinical symptoms 31 days after vaccination and the evidence of an inflammatory response 13 days after vaccination were consistent with his causation theory.  Tr. 75.  Further, Dr. Gershwin noted that Oh et al. reported approximately 60% of their cases occurred around 12 to 13 days after vaccination while Felicetti et al. reported one to six weeks to be an appropriate range for vaccine-induced vasculitis.  Id. (citing Pet. Exs. 57, 87).

### 2.    Respondent's Expert, Mehrdad Matloubian, M.D., Ph.D.[55]

#### a.    Background and Qualifications

Dr. Matloubian a Professor of Medicine at the University of California, San Francisco.  Resp. Ex. F at 2.  He is board certified in internal medicine and rheumatology.  Id.  He holds a Ph.D. in virology/immunology.  Id. at 1; Resp. Ex. A at 1.  Dr. Matloubian received his Ph.D. and his M.D. from the University of California, Los Angeles after which he completed his fellowship, residency, and post-doctoral fellowship at the University of California, San Francisco.  Resp. Ex. F at 1.  Dr. Matloubian has a general rheumatology practice, and he estimated 70% of the patients he treats have inflammatory arthritis with the most common conditions being PMR and RA.  Id. at 3; Tr. 97-98.  Dr. Matloubian's research for the past 20 years has been focused on "innate and adaptive immune responses, including those of T and B cells, to acute and chronic viral infections."  Resp. Ex. A at 1. He has published numerous peer-reviewed articles in these areas.  Id.; Resp Ex. F at 10-14.  Dr. Matloubian was offered and admitted as an expert in rheumatology and immunology without objection.  Tr. 99.

---

[55] Dr. Matloubian filed two expert reports and testified at the hearing.  Resp. Exs. A, C; Tr. 92-179.

b.    Opinion

i.    Diagnosis

Dr. Matloubian opined seronegative RA was "the most likely diagnosis" for Petitioner's condition.  Tr. 100.  While Dr. Matloubian agreed that Petitioner's initial presentation involved "PMR-like symptoms," he disagreed that Petitioner ever suffered from PMR.  Tr. 121; see also Resp. Ex. A at 10; Resp. Ex. C at 4.  Instead, Dr. Matloubian opined Petitioner's "initial presentations of PMR-like symptoms was part of his seronegative [RA]."  Tr. 121-22; Resp. Ex. C at 4.

Dr. Matloubian opined Petitioner's clinical course, treatment with high doses of prednisone to control disease, persistent synovitis and tenosynovitis while on prednisone, and his response to sulfasalazine, methotrexate, and Arava (leflunomide) was more consistent with RA than PMR.  Tr. 100.

Dr. Matloubian explained that "since neither PMR nor seronegative RA are associated with a serological marker, at times it is difficult to initially distinguish the two clinically, especially since sometimes, seronegative RA can present with PMR-like symptoms."  Resp. Ex. C at 4; Resp. Ex. A at 8.  Due to overlap in symptomology, especially early on, "seronegative RA is in the differential diagnosis of PMR, and PMR is in the differential diagnosis of seronegative RA."  Id.  Because of this, patients with PMR are followed longitudinally even after being tapered off prednisone.  Id.  Further, Dr. Matloubian testified it is "quite common" for providers to "reclassify an initial diagnosis of PMR."  Tr. 108.  In support, he cited medical literature that reported between 20% to 30% of patients who initially present with PMR are later diagnosed with seronegative RA.  Resp. Ex. A at 8 (citing Pet. Ex. 19);[56] Resp. Ex. C at 3; Tr. 109 (citing Pet. Ex. 73).

Looking at Petitioner's case, Dr. Matloubian first opined that treatment with high doses of prednisone was unusual for PMR since most patients have symptom control with 20 mg of prednisone.  Tr. 109-10; Resp. Ex. A at 10.  He explained that "PMR in general tends to be very sensitive to treatment with prednisone with rapid resolution of symptoms within hours to several days after the first steroid dose."  Resp. Ex. A at 7 (citing Resp. Ex. A, Tab 2 at 5).[57]  Owens et al. noted that steroid-sparing agents or DMARDs can be used in PMR cases that do not respond to prednisone or where there is disease relapse.  Resp. Ex. A, Tab 2 at 5.  However, the authors acknowledged there is "little high-level evidence to support the efficacy" of these treatments in PMR.  Id.

---

[56] Carlo Salvarani & Francesco Muratore, Clinical Manifestations and Diagnosis of Polymyalgia Rheumatica, UpToDate, https://www.uptodate.com/contents/clinical-manifestations-and-diagnosis-of-polymyalgia-rheumatica (last updated Mar. 23, 2022).  The was also filed as Resp. Ex. A, Tab 1.

[57] C.E. Owens et al., Recent Advances in Polymyalgia Rheumatica, 45 Internal Med. J. 1102 (2015).

Next, while on a high dose prednisone, Petitioner underwent an ultrasound of his hands and wrists that showed mild to moderate synovitis. Resp. Ex. C at 3. Dr. Matloubian opined the "refractory nature of his synovitis to high dose prednisone is highly suggestive of a process other than PMR, such as RA." Id. Dr. Matloubian acknowledged that the presence of hand synovitis "can be consistent with PMR." Resp. Ex. A at 7. However, he explained that hand synovitis is a non-specific finding also seen in RA. Id. Further, Dr. Matloubian noted that Petitioner's synovitis led his treating providers to consider seronegative RA as a differential diagnosis. Resp. Ex. A at 3, 7-8; see also Pet. Ex. 3 at 18 ("[S]eronegative [RA] [is] in the differential particularly given mild to moderate synovitis noted on ultrasound and predominant involvement of hands and wrists.").

Dr. Matloubian noted that Petitioner's initial examination with PA George revealed tender elbows and ankles. Resp. Ex. C at 3 (citing Pet. Ex. 3 at 7). He opined this was "unusual for PMR." Id. Dr. Matloubian explained seronegative RA's major manifestation is peripheral arthritis, mainly in the small joints of the hands and feet, which left untreated may result in deformity and destruction of joints as evident by bony erosions on X-rays. Resp. Ex. A at 8 (citing Resp. Ex. A, Tab 4);[58] see also Resp. Ex. A, Tab 6 at 2 ("Most patients with RA report involvement of small joints first . . . with involvement of large joints occurring later."). Relying on Salvarani and Muratore, Dr. Matloubian explained that in PMR "distal symptoms, generally mild, accompany the characteristic proximal symptomatology in approximately one-half of [PMR] patients, most commonly at the wrists and [MCP] joints, and occasionally at the knees, but not the feet and ankles." Resp. Ex. C at 3 (citing Resp. Ex. A, Tab 1 at 4, 7-8 (noting "the feet and ankles are never affected")). Dr. Matloubian concluded involvement of Petitioner's feet and ankles was a typical feature of RA rather than PMR. Id.

Turning to physical examinations, Dr. Matloubian acknowledged that Petitioner's providers never documented warmth in joints during examinations or joint swelling after November 2018. Tr. 154-55. However, Dr. Matloubian noted that, in January 2019, Petitioner's rheumatology providers began including a DAS28 score in the joint examination documentation. Tr. 156. He explained that DAS28 is only used to measure disease activity in RA but not PMR. Id. Dr. Matloubian opined that use of DAS28 suggested Petitioner's treating rheumatologist favored a diagnosis of seronegative RA or polyarthritis. Id.

In 2021, Petitioner began sulfasalazine and methotrexate with good response. Resp. Ex. C at 3. According to Dr. Matloubian, both these medications are "commonly used in the treatment of RA" and are "first line therapy." Id. (citing Resp. Ex. A, Tab 6 at 16-17). O'Dell et al. noted all RA patients "should receive DMARD therapy" and identified synthetic DMARDs, including sulfasalazine and methotrexate, as "gold standard" treatment for halting or slowing RA. Resp. Ex. A, Tab 6 at 16-17. Dr. Matloubian opined that DMARDs are "not established to be effective for PMR." Tr. 112; see also Pet. Ex. 73 at 7 ("[M]ost synthetic and biological DMARDs are scarcely or totally ineffective in PMR and effective in [seronegative elderly-onset RA]."). Thus, Dr. Matloubian concluded Petitioner's "course of treatment with sulfasalazine and

---

[58] Iain McInnes & George Schett, The Pathogenesis of Rheumatoid Arthritis, 365 NEJM 2205 (2011).

methotrexate is a more typical therapy plan for RA than for PMR." Resp. Ex. C at 4. Further, Dr. Matloubian noted Petitioner had a reduction in hand symptoms following treatment with methotrexate and leflunomide which he "would not expect with PMR." Tr. 114-15, 119-20.

Next, Dr. Matloubian opined that his assessment of seronegative RA was "consistent with the impression of [Petitioner's] providers." Resp. Ex. C at 3. While Dr. Matloubian agreed that Petitioner's providers initially diagnosed him with atypical PMR, they considered the possibility of RA at his initial visit to the Idaho Arthritis Center. Resp. Ex. C at 3; Resp. Ex. A at 2; Tr. 117-18. By September 1, 2021, "inflammatory polyarthropathy was the leading diagnosis with PMR being second." Resp. Ex. C at 3 (citing Pet. Ex. 70 at 4); Tr. 120. At the same visit, the treating provider noted Petitioner's current symptoms were "less suggestive" of PMR. Resp. Ex. C at 3 (citing Pet. Ex. 70 at 4). Dr. Matloubian testified that inflammatory polyarthropathy is the same diagnosis as RA. Tr. 178-79. On October 15, 2021, Petitioner's rheumatologist explained that while he had an "initial working diagnosis of [PMR]" his "peripheral joint involvement and symptoms [were] more suggestive of a seronegative inflammatory arthropathy." Id. (citing Pet. Ex. 70 at 9). Notably, at the December 9, 2024 visit, Petitioner's rheumatologist described a "working diagnosis of seronegative inflammatory arthritis/[RA]." Tr. 171 (quoting Pet. Ex. 85 at 29). Dr. Matloubian testified that treating providers' notes demonstrate "a revision of their thinking" that Petitioner's "diagnosis [was] more likely seronegative [RA], rather than PMR." Tr. 120.

Dr. Matloubian acknowledged that the medical records continued to include PMR as a diagnosis. Tr. 120. However, he opined that more weight should be given to the assessment details than diagnostic codes. Id. Further, he noted that providers tend "to copy from one visit to another and carry over diagnosis without really changing them." Id. Dr. Matloubian conceded PMR is also considered an inflammatory polyarthropathy. Tr. 172. However, he testified the context of the medical records demonstrate Petitioner's rheumatologist treated inflammatory polyarthropathy and RA as the "same diagnosis" and distinct from PMR. Tr. 172-73, 178-79.

In response to Dr. Gershwin's argument that Petitioner did not meet the 1987 classification criteria for RA, Dr. Matloubian opined Petitioner "clearly meets the updated 2010 criteria for classification of RA." Resp. Ex. C at 4. Applying the 2010 criteria, Dr. Matloubian explained Petitioner's ultrasound showed synovitis "which can be interpreted as >10 joints [involvement] giving him [four] points." Id. Petitioner also had elevated inflammatory markers, giving him one point, and he had symptoms for more than six weeks, giving him another point. Id. Thus, Petitioner had a total of six points and satisfied the 2010 criteria. Id.

Addressing inflammatory markers, Dr. Matloubian first explained that elevated inflammatory markers are nonspecific and do not distinguish between PMR, RA, or an infection. Tr. 115. He acknowledged that Petitioner's CRP and ESR normalized and that later tests were conducted while Petitioner was on medication. Tr. 159-60. Dr. Matloubian also testified that "inflammatory markers don't always correlate with disease activity." Tr. 160.

Finally, Dr. Matloubian disagreed that Petitioner's ongoing symptoms could be wholly attributed to osteoarthritis. See Tr. 106-07, 161-62. He agreed that Petitioner had a history of osteoarthritis mainly affecting his knees. Tr. 125. Dr. Matloubian explained osteoarthritis and

31

RA are distinct diseases, though they can occur concurrently.  Id.  While Dr. Matloubian agreed that Petitioner's X-rays showed evidence of osteoarthritis, he opined "that does not rule out coexistence of an inflammatory arthritis such as RA."  Resp. Ex. C at 3.  He explained that ultrasound is the more sensitive test for finding synovitis, a sign of inflammation.  Id.  In his second report, Dr. Matloubian opined "[P]etitioner's X-rays and ultrasound findings were consistent with osteoarthritis with overlying inflammatory arthritis due to RA."  Id.  However, Dr. Matloubian later testified that he did not "think [Petitioner's] synovitis was due to osteoarthritis.  Tr. 152.  He explained that Petitioner did not complain of difficultly making a fist prior to December 2018 and that Petitioner's synovitis and difficulty making fists were "new symptoms."  Tr. 106, 152.  While Dr. Matloubian agreed that synovitis can also be seen in osteoarthritis, he testified that synovitis due to osteoarthritis was "much milder."  Tr. 150.  Finally, he opined that ongoing symptoms due to osteoarthritis would not be expected to improve with methotrexate or leflunomide.  Tr. 158-59.

For the above discussed reasons, Dr. Matloubian concluded seronegative RA was "the most likely diagnosis" for Petitioner's condition.  Tr. 100.

### ii.        Althen Prong One

Dr. Matloubian opined "more likely than not," Petitioner's flu vaccine "did not lead to his development of PMR or, more accurately, seronegative [RA]."  Resp. Ex. C at 1.

Dr. Matloubian characterized Dr. Gershwin's casual theory as an

> aberrant or dysregulated, sort of a broad, nonspecific activation of the immune system that happens in response to the [flu] vaccine in a genetically susceptible individual, and that [] immunosenescence [] leads to homing of T cells and B cells to joints and muscles, causing symptoms of PMR.

Tr. 130.  He added that this process was "driven by IL-6 specifically."  Id.  Dr. Matloubian disagreed with this theory.  Id.  First, Dr. Matloubian noted that the pathogenesis and mechanism of PMR "remains largely unknown."  Resp. Ex. A at 8.  "As a result, the sequence of events that leads to development of inflammation and secretion of inflammatory cytokines, such as IL-6, [are] not known."  Id.

Dr. Matloubian agreed that genetic and environmental factors "likely" contribute to development of PMR.  Tr. 164.  But he also opined that environmental factors may not be required for the development of PMR.  Id.  Dr. Matloubian disagreed that PMR has been "established to be a post-infectious disease" and he emphasized that the cause of PMR remains unknown.  Resp. Ex. C at 5.

Addressing the relationship between IL-6 and PMR, Dr. Matloubian opined there was "no reliable evidence" that IL-6 or any other cytokine is "sufficient to cause a dysregulated immune response" leading to PMR.  Tr. 130-31.  Rather, Dr. Matloubian characterized IL-6 as the "end result" of disease process and explained that it is commonly found "when the immune system is dysregulated due to whatever processes that cause autoimmune diseases."  Tr. 134.

While Dr. Matloubian agreed IL-6 is elevated in PMR, he explained that IL-6 is a "product of the activation of the immune system."  Tr. 131.

Looking at the review article by Choy et al.,[59] Dr. Matloubian explained IL-6 is "a product of dysregulation of the immune system and the common pathway in many diseases."  Tr. 133 (citing Resp. Ex. A, Tab 14).  He opined Choy et al. supports the concept that IL-6 does not drive or trigger the disease process but instead is "a common inflammatory pathway."  Tr. 134.  Dr. Matloubian noted that the fact that IL-6 is present in the disease course, and that it contributes to disease pathogenesis, does not indicate that it triggered the disease.  Resp. Ex. C at 5.

Dr. Matloubian criticized Dr. Gershwin's assertion that "IL-6 is produced after a memory B cell response in [three to five] days to up to [six] weeks following vaccination."  Resp. Ex. A at 17 (citing Pet. Ex. 18 at 3).  Instead, Dr. Matloubian explained that systemic cytokine responses are "typically self-limited" and do not last for weeks to months.  Id. (citing Resp. Ex. A, Tab 22).[60]  The study by McDonald et al. "measured the local and systemic inflammatory response after [flu] vaccination or infection in neonatal, young adult[,] and aged mice."  Resp. Ex. A, Tab 22 at 1.  Reviewing the results, and focusing on IL-6, Dr. Matloubian explained IL-6 is produced in mice within four to six hours of vaccination, rapidly falls within 24 to 48 hours, and returns to baseline within 72 hours.  Tr. 133 (citing Resp. Ex. A, Tab 22 at 4 fig. 1).  Of note, the young mice cohort had a greater IL-6 response to immunization than the aged mice.  Id.  Dr. Matloubian acknowledged that the mice in the study were "all genetically similar."  Id.

Further, Dr. Matloubian noted that the Institute of Medicine ("IOM") found "no evidence that directly or indirectly support[ed] over secretion of cytokines as an operative mechanism" in vaccine-related adverse events.  Resp. Ex. A at 17 (quoting Resp. Ex. A, Tab 23);[61] see also Tr. 134.  The IOM noted profound systemic oversecretion of cytokines, known as a cytokine storm,[62] had not been reported following vaccine administration.  Resp. Ex. A, Tab 23 at 11-12.  The IOM acknowledged that "more subtle imbalances of proinflammatory and anti-inflammatory cytokines may occur following" rubella, human papillomavirus, or hepatitis B vaccinations.  Id.

---

[59] Ernest H. Choy et al., Translating IL-6 Biology into Effective Treatments, 16 Nature Revs. Rheumatol. 335 (2020).

[60] Jacqueline U. McDonald et al., Inflammatory Responses to Influenza Vaccination at the Extremes of Age, 151 Immunology 451 (2017).

[61] Inst. of Med., Adverse Events Associated with Childhood Vaccines: Evidence and Causality (Kathleen Stratton et al. eds., 2012).

[62] The IOM described cytokine storm, which may occur in the situation of a "massive immune activation[,]" such as "bacterial sepsis, avian [flu], acute respiratory distress syndrome, hemophagocytic lymphohistiocytosis, and macrophage activation syndrome," and result in "[i]ncreased levels of proinflammatory cytokines."  Resp. Ex. A, Tab 23 at 11-12.  There is no evidence here of cytokine storm.

at 12. "Moreover, it is possible that the unique immunogenetic makeup of an individual might predispose that individual to an exaggerated cytokine imbalance following immune stimulation such as microbial infection or vaccine administration." Id.

Dr. Matloubian also disagreed that the case studies provided by Dr. Gershwin supported a causal association between flu vaccination and PMR. Resp. Ex. A at 13. He testified that case studies are not a "reliable indicator of vaccine causation." Tr. 145. He noted that Dr. Gershwin provided a "number of case reports describing temporal association between immunization and development of various types of vasculitis, although [Dr. Gershwin] concede[d] that PMR 'itself is not considered a classic vasculitis.'" Id. (quoting Pet. Ex. 18 at 2). Dr. Matloubian emphasized that Petitioner was never diagnosed with GCA or any other form of vasculitis. Id. Regardless, Dr. Matloubian opined that medical literature showed a lack of association between vaccination and vasculitis. Resp. Ex. C at 1; Resp. Ex. A at 13-14 (citing Resp. Ex. A, Tab 18).[63]

Next, Dr. Matloubian critiqued the study by Falsetti et al., arguing the authors relied on patient-reported exposure to alleged environmental trigger without verification of events such as vaccinations or upper respiratory infections. Resp. Ex. A at 14 (citing Pet. Ex. 59). Further, the authors did not provide "any information regarding the interval time between any alleged environmental trigger and development of PMR." Id. Finally, Dr. Matloubian noted that Falsetti et al. seemed to "favor a mechanism based on the action of the adjuvants as an explanation for PMR in their vaccinated patients." Id. Dr. Matloubian observed that the ASIA theory has been "largely discredited" and that Petitioner did not receive an adjuvanted vaccine. Id. (citing Resp. Ex. A, Tab 19).[64]

Dr. Matloubian disagreed that Oh et al. provided "reliable evidence that [flu] vaccination increases risk of PMR." Tr. 142. Looking at the supplementary material for Oh et al., Dr. Matloubian highlighted that vaccine-associated PMR data included eight cases of PMR in individuals age zero to 17. Tr. 138 (citing Resp. Ex. E at 39 tbl. S6). Dr. Matloubian opined this data was incorrect as individuals younger than 50 do not have PMR. Id. The authors also reported 1,056 people with PMR between the ages of 18 and 64. Id.; Resp. Ex. E at 39-40 tbl. S6. Dr. Matloubian noted the authors did not indicate how many of these people were between 50 and 64 years old, the ages within which PMR occurs. Id. Thus, he opined that this data was of dubious quality and unreliable. Id.

Next, Oh et al. reported 351 cases of PMR associated with flu vaccine. Resp. Ex. E at 39-40 tbl. S6. Dr. Matloubian noted these cases occurred over a 55-year period, and given this extended period, he did not "consider this to be an enormous number of PMR [cases] occurring . . . in association with the [flu] vaccine." Tr. 139. Further, Dr. Matloubian did not consider the

---

[63] Caterina Bonetto et al., Vasculitis As an Adverse Event Following Immunization - Systematic Literature Review, 34 Vaccine 6641 (2016).

[64] Rohan Ameratunga et al., Evidence Refuting the Existence of Autoimmune/Autoinflammatory Syndrome Induced by Adjuvants (ASIA), 5 J Allergy Clin. Immunol. Pract. 1551 (2017).

Oh et al. study a reliable indication of causation due to its self-reporting methodology, comparing it to the passive collection of data used by VAERS. Tr. 139-42. Relying on Shimabukuro et al.,[65] Dr. Matloubian advised the data from passive surveillance systems must be "interpreted with caution" since it "can lead to erroneous conclusions about cause and effect for the risk of adverse events after vaccination." Tr. 139-40 (quoting Resp. Ex. D at 1).

Lastly, Dr. Matloubian discussed the problem of bias which may occur with using, like that used in the Oh et al. study, where a condition such as PMR is reported to happen more often with the flu vaccine. Tr. 140. As in VAERS, the Oh et al. data does not include the total number of people who received the vaccination, the total who had an adverse event (PMR), or the incidence of the adverse events in unvaccinated people (the comparative group who did not get the vaccine but developed PMR). Tr. 141. Dr. Matloubian explained that this type of analysis does not "demonstrate a true increased incidence of an adverse event, causal association, or safety problem." Tr. 142-44. He criticized Dr. Gershwin's conclusion that Oh et al. supported causation and opined that there was a "high probability of PMR occurring through coincidence alone after an immunization." Tr. 142-45; Resp. Ex. A at 16.

Dr. Matloubian concluded that the cause of PMR is not known, and that Petitioner's expert agreed that the cause is not known. Resp. Ex. A at 18. Further, Dr. Matloubian opined that the Petitioner's medical theory is not supported by the medical literature cited by Dr. Gershwin. Id. Finally, Dr. Matloubian opined that Petitioner's theory is speculative as applied to either PMR or seronegative RA. Id.

### iii.        <u>Althen</u> Prongs Two and Three

Regarding prong two, Dr. Matloubian opined that Petitioner's PMR, which was later characterized as seronegative RA, was not caused by the flu vaccination. Resp. Ex. A at 18. Petitioner received multiple prior flu vaccines but did not ever have any PMR symptoms or other adverse events after these immunizations. Id. at 17; see also Pet. Ex. 5 at 9, 21; Pet. Ex. 4 at 57. Like Dr. Gershwin, Dr. Matloubian acknowledged that a genetic component likely exists in the development of PMR, however, he testified that PMR patients do not typically undergo genetic testing. Tr. 103. Regardless, Dr. Matloubian noted that Dr. Gershwin did not provide evidence from Petitioner's past history that would support a conclusion that he had a genetic predisposition to develop an exaggerated immune system response to vaccination. Resp. Ex. A at 18. More likely, according to Dr. Matloubian, Petitioner did not have any exaggerated responses to vaccination, especially since elderly persons have less vigorous responses to vaccines, and that is why they require a higher dose to create immunity. Id.

Dr. Matloubian conducted an "extensive literature review" about the causes of PMR, "while keeping in mind Dr. Gershwin's proposed theory that induction of cytokines such as IL-6 by vaccines can lead to induction of PMR." Resp. Ex. C at 1. Based on his research and analysis, Dr. Matloubian concluded that "more likely than not," Petitioner's flu vaccine did not

---

[65] Tom T. Shimabukuro et al., <u>Safety Monitoring in the Vaccine Adverse Event Reporting System (VAERS)</u>, 33 Vaccine 4398 (2015).

cause Petitioner's PMR or seronegative RA.  Id.  Dr. Matloubian disagreed that he based his opinion solely on epidemiology or that he demanded such evidence.  Id.

Addressing Althen prong three, and the onset of Petitioner's condition, Dr. Matloubian referenced Dr. Gershwin's review of the records, and disagreed that Petitioner developed knee pain two weeks after his flu vaccination.  Resp. Ex. A at 16 (citing Pet. Ex. 18 at 2).  Instead, Dr. Matloubian noted that Petitioner complained of knee pain on November 16, 2018, the date of vaccination, and although a musculoskeletal examination was not documented, review of systems was significant for "joint pain and swelling."  Id. (citing Pet. Ex. 4 at 50).  Petitioner was referred to his orthopedist, who he saw on November 29, 2018, and reported that he had knee pain "for the last [three] weeks."  Id. (citing Pet. Ex. 2 at 14).  Dr. Matloubian explained that this timeline placed onset of knee pain one week prior to vaccination on November 16, 2018.  Id.

Next, Dr. Matloubian disagreed with Dr. Gershwin's interpretation of the orthopedist's November 29 note, regarding whether Petitioner had an inflammatory process in his right knee.  Resp. Ex. A at 16 (citing Pet. Ex. 18 at 2; Pet. Ex. 2 at 14).  Dr. Matloubian explained that while Petitioner had "some swelling and a small joint effusion" on November 29, 2018, this can occur due to a knee injury, a "non-inflammatory process," and, if there is no warmth or redness, "does not necessarily constitute an inflammatory etiology."  Id.  Moreover, Petitioner had previous knee replacement surgery, so the orthopedist did tests to rule out infection.  Id.

Additionally, Dr. Matloubian disputed Dr. Gershwin's characterization of Petitioner's course over the following six weeks as a "gradual worsening of symptoms" when the medical providers documented Petitioner reported that he awoke with abrupt onset of symptoms in his shoulders and hips on December 17, 2018.  Resp. Ex. A at 17 (citing Pet. Ex. 18 at 2, Pet. Ex. 4 at 44).  Dr. Matloubian testified Petitioner had an "abrupt onset" of "diffuse systemic joint symptoms, including shoulders," on December 17, 2018.  Tr. 122.  According to Dr. Matloubian, Petitioner's affidavit also confirms an abrupt onset of symptoms December 17.  Resp. Ex. A at 17 (citing Pet. Ex. 17 at ¶ 4).  Dr. Matloubian opined that this abrupt onset is "consistent with typical presentation of PMR."  Id.  He cited Salvarani and Muratore, who stated, "onset can be abrupt, sometimes startling so, seeming to occur almost overnight.  A story of longstanding stiffness and aching does not suggest a diagnosis of PMR."  Pet. Ex. 19 at 4.

Given Dr. Gershwin's contention that Petitioner's knee pain was due to PMR/seronegative RA, Dr. Matloubian suggested onset would have been a week prior to vaccination on November 16, 2018, since Petitioner told his orthopedist on November 29 that he had symptoms for three weeks, placing onset approximately November 8.  Resp. Ex. A at 17.  Dr. Matloubian opined that an onset of November 8, 2018 would account for Petitioner's elevated inflammatory markers (ESR and CRP) tested on November 29, 2018.  Id.  Because Petitioner had no prior ESR and CRP studies, it is not possible to conclude that these markers were elevated due a post-vaccination inflammatory reaction or to condition that began before vaccination, as noted by Dr. Matloubian.  Id.

Finally, Dr. Matloubian responded to Dr. Gershwin's opinions about the timing of IL-6 production, first that it is produced immediately after vaccination and peaks within five to seven days, and second, that "IL-6 is produced after a memory B cell response in [three to five] days to

up to [six] weeks following vaccination." Resp. Ex. A at 17 (citing Pet. Ex. 18 at 3). Dr. Matloubian noted that Dr. Gershwin did not provide medical literature to support these propositions. Id. Further, Dr. Matloubian opined that cytokine responses after vaccination are "self-limited and do not last weeks to months." Id. As previously discussed, Dr. Matloubian relied on McDonald et al., a paper that studied cytokine responses to a primary flu vaccination. Id. (citing Resp. Ex. A, Tab 22). The authors found cytokine IL-6 peaks at four to six hours and returns to baseline by two to six days. Resp. Ex. A, Tab 22 at 4 fig. 1.

Regardless of onset and timing issues, Dr. Matloubian opined that Dr. Gershwin did not provide evidence that PMR patients have "an aberrant or exaggerated cytokine response" to the flu vaccination." Resp. Ex. A at 17. He further explained that there is no medical literature support for the theory that elevated cytokines lead to PMR. Id. He quoted the IOM, which concluded there is "no evidence that directly or indirectly support[ed] the over secretion of cytokines as an operative mechanism" in vaccine-related adverse events.[66] Id. (quoting Resp. Ex. A, Tab 23 at 11-12).

## II.    LEGAL FRAMEWORK

### A.    Standards for Adjudication

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

In particular, a petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321

---

[66] While the IOM stated that "more subtle imbalances of proinflammatory and anti-inflammatory cytokines may occur" following some vaccinations, the flu vaccination was not included in the list of relevant vaccines. Resp. Ex. A, Tab 23 at 12. Further, the report described the possibility that a unique immune system of an individual might cause "an exaggerated cytokine imbalance" after vaccine administration, but this possibility was not further described. Id.

(quoting <u>Shyface v. Sec'y of Health & Hum. Servs.</u>, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); <u>see also</u> <u>Pafford v. Sec'y of Health & Hum. Servs.</u>, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  The received vaccine, however, need not be the predominant cause of the injury.  <u>Shyface</u>, 165 F.3d at 1351.  A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors unrelated to the administration of the vaccine."  § 13(a)(1)(B).  However, if a petitioner fails to establish a prima facie case, the burden does not shift.  <u>Bradley v. Sec'y of Health & Hum. Servs.</u>, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case."  <u>Flores v. Sec'y of Health & Hum. Servs.</u>, 115 Fed. Cl. 157, 162-63 (2014); <u>see also</u> <u>Stone v. Sec'y of Health & Hum. Servs.</u>, 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); <u>de Bazan v. Sec'y of Health & Hum. Servs.</u>, 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); <u>Pafford</u>, 451 F.3d at 1358-59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . .  [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

## B.    Factual Issues

Petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim.  § 13(a)(1)(A).  To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony.  See <u>Burns v. Sec'y of Health & Hum. Servs.</u>, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records).

Medical records, specifically contemporaneous medical records, are presumed to be accurate and generally "warrant consideration as trustworthy evidence."  <u>Cucuras v. Sec'y of Health & Hum. Servs.</u>, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  <u>But see</u> <u>Kirby v. Sec'y of Health & Hum. Servs.</u>, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); <u>Shapiro v. Sec'y of Health & Hum. Servs.</u>, 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting <u>Murphy v. Sec'y of Health & Hum. Servs.</u>, 23 Cl. Ct. 726, 733 (1991), <u>aff'd per curiam</u>, 968 F.2d 1226 (Fed. Cir. 1992)), <u>recons. den'd after remand</u>, 105 Fed. Cl. 353 (2012), <u>aff'd mem.</u>, 503 F. App'x 952 (Fed. Cir. 2013).  The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  <u>Id.</u>  To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is

38

"consistent, clear, cogent, and compelling." Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing Blutstein v. Sec'y of Health & Hum. Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)), mot. for rev. den'd, 142 Fed. Cl. 247 (2019), vacated on other grounds & remanded, 809 F. App'x 843 (Fed Cir. 2020).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley, 991 F.2d at 1575.

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. Valenzuela v. Sec'y of Health & Hum. Servs., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.) but does not require the special master or court to be bound by them").

## C.    Causation

To receive compensation through the Program, Petitioner must prove either (1) that he suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that he suffered an injury that was actually caused by a vaccination. See §§ 11(c)(1), 13(a)(1)(A); Capizzano, 440 F.3d at 1319-20. Petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface, 165 F.3d at 1352-53).

Because Petitioner does not allege he suffered a Table Injury, he must prove a vaccine actually caused his injury. To do so, Petitioner must establish, by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen, 418 F.3d at 1278.

The causation theory must relate to the injury alleged. Petitioner must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner cannot

establish entitlement to compensation based solely on his assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor.  § 13(a)(1).  In determining whether Petitioner is entitled to compensation, the special master shall consider all material in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation."  § 13(b)(1)(A).  The special master must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in Petitioner's favor when the evidence weighs in his favor.  See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); Althen, 418 F.3d at 1280 (noting that "close calls" are resolved in Petitioner's favor).

Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred.  See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 573-74 (2015) (denying Petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard).  The Federal Circuit has made clear that the mere possibility of a link between a vaccination and a petitioner's injury is not sufficient to satisfy the preponderance standard.  Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by a preponderance of the evidence); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359-60 (Fed. Cir. 2019).  While certainty is by no means required, a possible mechanism does not rise to the level of preponderance.  Moberly, 592 F.3d at 1322; see also de Bazan, 539 F.3d at 1351.

## III.    ANALYSIS

### A.    Diagnosis

As Federal Circuit precedent establishes, in certain cases it is appropriate to determine the nature of an injury before engaging in the Althen analysis.  Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010).  Since "each prong of the Althen test is decided relative to the injury[,]" determining facts relating to the claimed injury can be significant in a case where diagnosis is not clear.  Id.  Here, the parties dispute diagnosis, and so it is appropriate to first resolve that issue.

The undersigned finds preponderant evidence supports a finding that Petitioner's diagnosis was PMR.  Although medical records show that both PMR and seronegative RA were considered as differential diagnoses, the weight of the evidence supports a diagnosis of PMR.  This finding is based on the opinions and records of Petitioner's treating physicians, the letters from Dr. Durham, Petitioner's understanding of his diagnosis, and the opinions of Dr. Gershwin.

Petitioner was diagnosed with "presumptive PMR" on December 26, 2019, by his PCP, Dr. Durham.  Pet. Ex. 4 at 39.  Two weeks later, on January 14, 2029, Petitioner was seen by PA George at the Arthritis Center who noted Petitioner's history was "suspicious" for PMR with the "possibility of [RA] or another reactive type arthritis . . . lower in the differential."  Pet. Ex. 3 at 6.  At the next visit, on January 28, PA George assessed Petitioner with "likely atypical [PMR]."

Id. at 11.  Seronegative RA remained a differential diagnosis.  At Petitioner's first appointment with rheumatologist Dr. Palfreyman, on April 2, 2019, the diagnosis was "likely atypical [PMR.]"  Id. at 18.  Moving to November 2020, Petitioner's diagnosis remained PMR with osteoarthritis added as a second diagnosis.  In December 2020, Dr. Palfreyman again opined Petitioner had atypical PMR and concurrent osteoarthritis.  In the fall of 2021, however, Petitioner's providers noted that his symptoms had become "less suggestive of PMR" and "more suggestive of seronegative inflammatory arthropathy."  Pet. Ex. 70 at 4, 9, 14, 19.  In May 2022, Dr. Palfreman documented that Petitioner had not had any recurrence of PMR and that his diagnosis was seronegative arthropathy and osteoarthritis.

Reading the records as a whole, it appears that Dr. Palfreyman, Petitioner's primary rheumatologist, did not abandon the diagnosis of PMR, but instead in 2022 determined that Petitioner had no recurrence of PMR.  Thus, the undersigned finds Petitioner initially had PMR, but that by the fall of 2021, his symptoms had changed, and he held a different diagnosis.  Further, Petitioner did not have a recurrence of PMR in 2022.  However, the undersigned does not interpret the records and opinions of the treating physicians to indicate that his initial diagnosis of atypical PMR was inaccurate.

This interpretation is supported by the 2021 and 2023 letters authored by Dr. Durham, who confirmed that Petitioner's diagnosis was PMR.  See Pet. Ex. 16 at 1 (reporting Petitioner "developed [PMR]"); Pet. Ex. 77 at 2 (opining Petitioner had severe and treatment resistant PMR).  Dr. Durham cited a medical article explaining that in older patients' synovitis may not be due to seropositive RA, but "may be closely related to or identical to PMR."  Pet. Ex. 77 at 2.

Here, the undersigned gives weight to the statements of Petitioner's treating physicians as they are "in the best position" to determine Petitioner's injury.  See Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326; Cucuras, 993 F.2d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence").

Further, Petitioner's expert Dr. Gershwin, opines that Petitioner's diagnosis was PMR.  Dr. Gershwin opined that Petitioner's abrupt onset on December 17, 2018 was classic for PMR, that Petitioner's clinical examination and imaging studies were consistent with PMR, that Petitioner satisfies EULAR/ACR provisional classification criteria for PMR, and that Petitioner did not satisfy either the 1987 or 2010 classification criteria for seronegative RA.

Lastly, in his affidavit, Petitioner refers to his diagnosis as PMR.  His understanding of his diagnosis of PMR is consistent with the medical records and the opinions of the treating physicians and supports the undersigned's finding.

In conclusion, although Dr. Matloubian offered reasonable opinions disputing the diagnosis of PMR, the undersigned finds that the greater weight of the evidence supports a diagnosis of PMR.

## B.    Causation

### 1.    Althen Prong One

41

Under Althen prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury.  Andreu, 569 F.3d at 1375; Pafford, 451 F.3d at 1355-56.  Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation.  Boatmon, 941 F.3d at 1359; see also Knudsen, 35 F.3d at 548; Veryzer v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 214, 257 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable").  If Petitioner relies upon a medical opinion to support his theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion.  See Broekelschen, 618 F.3d at 1347 ("The special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories."); Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing Fehrs v. United States, 620 F.2d 255, 265 (Ct. Cl. 1980))).

The undersigned finds that Petitioner failed to prove a causal mechanism by preponderant evidence as required under Althen prong one for the following reasons.

Dr. Gershwin's causal theory described in his expert reports was difficult to understand.  In his first report, he offered a lengthy laundry list of immune system players and pulled statements from different publications, implicating the innate and adaptive immune system in a complex presentation that did not explain how the flu vaccine can cause PMR.  See, e.g., Pet. Ex. 18 at 3.  At the end of his first report, he narrowed his theory, explaining that after vaccination, the vaccine antigen migrates to regional lymph noes where it is processed by antigen presenting cells.  He avers that this process results in the production of cytokines, which affect joint tissue and muscles.  This explanation was more comprehensible, but overall, he fails to show that cytokine-induced inflammation could trigger PMR.

At the hearing, Dr. Gershwin opined that the cytokine IL-6 contributes to a redistribution of B cells toward an inflammatory bias and/or caused dysregulation of the immune system.  He opined that there is a cytokine response to the flu vaccine in a genetic susceptible host who has immune dysregulation and/or immunosenescence, and this causes an inflammatory response on a dysregulated immune system, causing a redistribution of B cells towards an inflammatory bias (enhanced IL-6 response).  See Tr. 58-61.  In support of this theory, he relied on a paper by van der Geest et al.  See Pet. Ex. 51 at 9.  Dr. Gershwin opined that the authors found that B cells redistribution produced IL-6, causing a movement or homing of cells.  Tr. 59.  However, the authors of van der Geest et al. did not conclude that cytokines caused PMR.  They instead noted that B cells produce "not only antibodies, but also cytokines that modulate immune responses."  Pet. Ex. 51 at 10.  The primary finding of the study was that "the homeostasis of B cells is highly disturbed in patients with GCA and PMR."  Id.  Based on the findings, the authors suggested that "the distribution of B cells is highly disturbed in GCA and PMR," and "that B cells likely contribute to the enhanced IL-6 response in both diseases."  Id.  But they did not conclude that PMR was a cytokine IL-6-induced disease or that vaccination could cause cytokine-induced PMR.  Further, the idea that the flu vaccine induces a redistribution of immune cells (B cells)

42

toward an inflammatory bias is not supported by van der Geest et al.  As such, Dr. Gershwin has mischaracterized the paper, rendering his opinion less persuasive.

Respondent's expert Dr. Matloubian, characterized Dr. Gershwin's theory as follows: there is "an aberrant or dysregulated . . . broad, nonspecific activation of the immune system . . . in a genetically susceptible individual, and that [] immunosenescence [] leads to homing of T cells and B cells to joints and muscles, causing symptoms of PMR" and that the process was "driven by IL-6." Tr. 130.  While Dr. Matloubian agreed that genetic and environmental facts contribute to the development of PMR, he opined that the pathogenesis of PMR is not known. He further explained that there is no reliable evidence to implicate IL-6, or other cytokines, in the induction of PMR.  Instead of IL-6 being a cause of disease, Dr. Matloubian opined that IL-6 is a byproduct or end result of the disease process.  That is, although IL-6 is elevated in PMR, it is a "product of the activation of the immune system" rather than the cause of PMR.  Tr. 131.

Further, Dr. Matloubian opines that cytokine responses after vaccination are usually self-limited and do not last for days and weeks.  The mice study by McDonald et al. shows that while IL-6 is produced within four to six hours of vaccination, falls rapidly thereafter, and returns to baseline within 72 hours.  Overall, the undersigned finds Dr. Matloubian's opinions more persuasive and consistent with the medical literature evidence, and finds that Petitioner has not provided evidence to support a cytokine theory because he has not established how the flu vaccination can induce cytokines to cause PMR.

The undersigned's finding regarding Petitioner's cytokine theory is consistent with her past Decisions and prior Vaccine Act cases.  Recently, in Jett-Crawford, the undersigned analyzed Dr. Gershwin's cytokine-based causal theory and determined it was unpersuasive.  Jett-Crawford v. Sec'y of Health & Hum. Servs., No. 21-2157V, 2026 WL 1079719, at *22-24 (Fed. Cl. Spec. Mstr. Mar. 23, 2026), mot for rev. filed (Apr. 23, 2026).  Other special masters have also rejected the same or similar cytokine theories for a wide range of alleged injuries, including PMR.  See, e.g., Giesbrecht v. Sec'y of Health & Hum. Servs., No. 16-1338V, 2023 WL 2721578, at *7 (Fed. Cl. Spec. Mstr. Mar. 30, 2023) (rejecting Dr. Gershwin's theory that "an innate immune response involving cytokine production" caused the petitioner's PMR); Sciortino v. Sec'y of Health & Hum. Servs., No. 22-99V, 2024 WL 4579389, at *13 (Fed. Cl. Spec. Mstr. July 24, 2024) (finding Dr. Gershwin's proposed cytokine driven process unpersuasive and denying petitioner's vaccine-induced PMR claim); Landis v. Sec'y of Health & Hum. Servs., No. 15-1562V, 2019 WL 7844617, at *11 (Fed. Cl. Spec. Mstr. Aug. 20, 2019) (citing cases and rejecting theory that cytokines cause osteoarthritis); Baron v. Sec'y of Health & Hum. Servs., No. 14-341V, 2019 WL 2273484, at *18-19 (Fed. Cl. Spec. Mstr. Mar. 18, 2019) (rejecting theory that cytokines cause anti-NMDA encephalitis); Langley v. Sec'y of Health & Hum. Servs., No. 17-837V, 2022 WL 897959, at *15 (Fed. Cl. Spec. Mstr. Mar. 3, 2022) (rejecting theory that cytokines can cause an anxiety disorder and citing cases).

Specific to the flu vaccine and PMR, there are three cases on point.  See Jett-Crawford, 2026 WL 1079719; Giesbrecht, 2023 WL 2721578; Sciortino, 2024 WL 4579389.  In all three cases, the petitioners offered Dr. Gershwin as their expert, and like here, he offered a theory based on "an innate immune response involving cytokine production" which was found unpersuasive.  Jett-Crawford, 2026 WL 1079719, at *22-23; Giesbrecht, 2023 WL 2721578, at

43

*7; Sciortino, 2024 WL 4579389, at *9, *13.  In Sciortino, the Chief Special Master explained Dr. Gershwin's theory

> relies heavily on a cytokine-drive process that conflates innate and [adaptive] immune phases, but largely focusing on the vaccine's initial stimulation of cytokine production—but without a persuasive or reliable showing that this initial upregulation of cytokines is likely to instigate a disease process that will involve many other aspects of the immune response.

Sciortino, 2024 WL 4579389, at *13.  The undersigned agrees with the reasoning and conclusions of the Chief Special Master in Sciortino and finds it applicable to the present case.

Moreover, none of the case reports referenced by Dr. Gershwin discussed Petitioner's cytokine theory to explain how the flu vaccine can cause PMR.  Several articles reiterated the fact that the cause of PMR is not known.  For example, Falsetti et al. note that despite advances in treatment, the cause of PMR "remains an intriguing matter of debate."  Pet. Ex. 36 at 4.  Bassendine and Bridge discussed adjuvants as potential triggers of autoimmune illness and referenced the ASIA theory of causation.  There is no evidence that the flu vaccine at issue here, however, contained an adjuvant.  Liozon et al. proposed that the elderly woman who developed PMR two weeks after flu vaccination may have had an antigenic response to viral or egg protein, but did not reach any conclusions, except that the flu vaccine was possibly associated with PMR.  Other case reports did not offer a causal theory.

Finally, Dr. Gershwin asserts that Oh et al., which found a signal between flu and PMR, is "an example" of "a very large series [used] in order to show that there is an association" between vaccination and PMR.  Tr. 65.  However, Dr. Gershwin agrees that safety signals do not prove causation.  The study by Oh et al. relies on data collected through a passive surveillance system, similar to VAERS, and uses a disproportionality analysis to assess safety signals.  Dr. Matloubian provided medical literature explaining data from passive surveillance systems must be "interpreted with caution" since it "can lead to erroneous conclusions about cause and effect for the risk of adverse events after vaccination."  Tr. 139-40.  Specifically, Dr. Matloubian explains the data relied on by Oh et al. does not include the total number of people who received the vaccination, the total who had an adverse event (PMR), or the incidence of the adverse events in unvaccinated people (the comparative group who did not get the vaccine but developed PMR).

The undersigned notes that Petitioner has no obligation to provide statistical or epidemiological evidence.  See, e.g., Capizzano, 440 F.3d at 1325-26 (explaining a petitioner need not make a specific type of evidential showing (i.e., epidemiologic studies) to satisfy his burden, and instead, may present circumstantial evidence and reliable medical opinions).  Here, however, Petitioner has not provided the requisite circumstantial evidence or reliable medical opinion to satisfy his burden.

Overall, Dr. Gershwin initially offered a broad theory that implicate both the innate and adaptive immune system, driven by a cytokine process, in a genetically susceptible host, who is older and subject to immnosenescence and immune dysregulation.  In the alternative, he offers a narrower theory focused on cytokines.  However, he did not provide evidence that the flu

44

vaccine causes cytokines to trigger PMR. Dr. Gershwin acknowledges that the mechanism of PMR "still remains enigmatic." Pet. Ex. 18 at 2. As also explained by Dr. Matloubian, the cause of PMR is not known. This lack of knowledge cannot be substituted by overly complex reports that contain a laundry list of immune processes, nor can it be overcome by a simplistic cytokine theory that lacks foundational evidentiary support. The lack of knowledge about the pathogenesis of PMR explains the difficulty faced by Dr. Gershwin in offering a theory. He has culled pieces of information from various studies and tried to put them together to form a theory. However, this approach of casting a broad net renders Dr. Gershwin's opinions less persuasive overall. See Baron, 2019 WL 2273484, at *17 ("Although Petitioners . . . do not need to provide the specific components of the mechanism by which the vaccine[] at issue can cause [the alleged injury], they do need to propose something more than taking a vague 'kitchen sink' approach . . . . Petitioners have listed many possibilities but have not identified a sound and reliable explanation that can be applied to the vaccines and injury in this case.").

The last reason for the undersigned's finding is that the case law does not generally support a finding that PMR is a vaccine-related illness. Special masters have routinely found that vaccines, including flu, as described above, do not cause PMR. See Jett-Crawford, 2026 WL 1079719, at *1 (denying entitlement in flu/PMR case); Sciortino, 2024 WL 4579389, at *1 (same); Wilkinson v. Sec'y of Health & Hum. Servs., No. 18-1829V, 2024 WL 3857696, at *1 (Fed. Cl. Spec. Mstr. July 22, 2024) (same); Giesbrecht, 2023 WL 2721578, at *1 (same); Kelly v. Sec'y of Health & Hum. Servs., No. 17-1475V, 2022 WL 17819157, at*1 (Fed. Cl. Spec. Mstr. Oct. 12, 2022) (same); C.P. v. Sec'y of Health & Hum. Servs., No. 14-917V, 2019 WL 5483621, at *1 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (denying entitlement in flu/PMR and/or seronegative RA case); Van Dycke v. Sec'y of Health & Hum. Servs., No. 18-106V, 2023 WL 4310701, at *1, *26 (Fed. Cl. Spec. Mstr. June 7, 2023) (denying compensation in a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine and PMR/GCA case and noting that "[w]hile the mechanisms may differ, GCA/PMR has been rejected as a vaccine related injury due to insufficient evidence to support causation"); Suliman, 2018 WL 6803697, at *1 (same); Thompson v. Sec'y of Health & Hum. Servs., No. 18-1217V, 2023 WL 9053982, at *1 (Fed. Cl. Spec. Mstr. Dec. 5, 2023) (denying a pneumococcal conjugate/PMR claim).

Of note, the Federal Circuit recently affirmed the Chief Special Master's denial of Tdap/PMR claim. Munoz v. Sec'y of Health & Hum. Servs., No. 2025-1409, 2026 WL 1326559 (Fed. Cir. May 13, 2026), aff'g, 2024 WL 4113486 (Fed. Cl. Spec. Mstr. Aug. 12, 2024).

While the undersigned is not required to agree with her colleagues or find the reasoning of other cases controlling, she finds the above cases are well reasoned and inform her opinion about the present case. See Boatmon, 941 F.3d at 1358; Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

For all these reasons, the undersigned finds Petitioner has failed to provide preponderant evidence with respect to the first Althen prong.

**2.    Althen Prong Two**

45

Under <u>Althen</u> prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." <u>Capizzano</u>, 440 F.3d at 1324 (quoting <u>Althen</u>, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" <u>Pafford</u>, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. <u>Andreu</u>, 569 F.3d at 1367; <u>Capizzano</u>, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting <u>Althen</u>, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence since they are created contemporaneously with the treatment of the vaccinee. <u>Cucuras</u>, 993 F.2d at 1528. While the medical records and opinions of treating physicians must be considered, they are not binding on the special master. § 13(b)(1)(B) (specifically stating that the "diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court").

A petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." <u>Capizzano</u>, 440 F.3d at 1325. Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. <u>Id.</u> at 1325-26.

The undersigned finds that Petitioner has failed to prove <u>Althen</u> prong two by preponderant evidence because his clinical course is not consistent with Dr. Gershwin's theory of cytokine induction of the innate immune system. That is, there is no evidence that Petitioner had an abnormal or excessive cytokine response consistent with Dr. Gershwin's cytokine theory. Petitioner complained of an abrupt onset of diffuse joint stiffness approximately one month after vaccination. McDonald et al. shows that after the flu vaccination IL-6 is produced within four to six hours, falls rapidly within 24 to 48 hours, and then returns to baseline at 72 hours (three days). During days one to three post-vaccination, Petitioner did not describe symptoms consistent with PMR. Further, he did not experience any symptoms consistent with an exaggerated immune response.

Dr. Gershwin opines that Petitioner's elevated inflammatory markers (CRP and ESR) two weeks after vaccination are consistent with an immune response involving cytokines. Dr. Matloubian explained that these elevated markers would be consistent with Petitioner's visit on the date of vaccination (November 16, 2018) when Petitioner complained of knee pain. Regardless, because no baseline markers were drawn, the undersigned agrees with Dr. Matloubian, that it is speculative to conclude that the elevated CRP and ESP were elevated due to a post-vaccination inflammatory reaction rather than a condition that begin before vaccination.

Regarding the opinions of treating physicians, Petitioner's PCP, Dr. Durham, provided two letters. In the first, Dr. Durham states that he "suspects" that Petitioner's PMR was induced by the flu vaccine. Pet. Ex. 16 at 1. Dr. Durham does not offer any reasons for his suspicion. Dr. Durham's second letter is focused on the question of diagnosis. Dr. Durham opined that

Petitioner's diagnosis was PMR and that the synovitis was due to his PMR.  While the undersigned finds these letters informative as to the Petitioner's diagnosis, they are less persuasive as to causation.

Treating physician statements are typically "favored" as treating physicians "are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'"  Capizzano, 440 F.3d at 1326 (quoting Althen, 418 F.3d at 1280).  However, no treating physician's views bind the special master, per se; rather, their views are carefully considered and evaluated.  § 13(b)(1); Snyder, 88 Fed. Cl. at 746 n.67.  "As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases."  Welch v. Sec'y of Health & Hum. Servs., No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019).  Further, the undersigned will not rely on "opinion evidence that is connected to existing data only by the ipse dixit of the expert." Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2019 WL 2509626, at *19 (Fed. Cl. Spec. Mstr. May 24, 2019) (quoting Moberly, 592 F.3d at 1315).  Here, Dr. Durham does not provide foundational support, or an explanation, for his causational opinion.  Thus, the undersigned gives his opinion on causation little weight.

Because Petitioner has not proven Althen prong one, and he has not shown that his clinical course was consistent with the theory of cytokine induction propounded by Dr. Gershwin, the undersigned finds that he has failed to prove Althen prong two by preponderant evidence.

### 3.     Althen Prong Three

Althen prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged.  Althen, 418 F.3d at 1281.  That phrase has been defined as a "medically acceptable temporal relationship."  Id.  A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact."  de Bazan, 539 F.3d at 1352.  The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under Althen prong one).  Id.; Koehn v. Sec'y of Health & Hum. Servs., 773 F.3d 1579, 1243 (Fed. Cir. 2014); Shapiro, 101 Fed. Cl. at 542.  Thus, prong three contains two parts.  First, Petitioner must establish the "timeframe for which it is medically acceptable to infer causation" and second, they must demonstrate that the onset of the disease occurred in this period.  Shapiro, 101 Fed. Cl. at 542-43.

As described above in prong two, Petitioner's clinical course, including onset, was not consistent with an innate cytokine response described by Dr. Gershwin in Althen prong one.

Dr. Gershwin also addressed the appropriate timeframe for IL-6 production as part of an adaptive immune response, explaining that, as part of an adaptive immune response, IL-6 production would occur in a "period of [three to five] days to up to [six] weeks following the vaccination."  Pet. Ex. 18 at 3.  Dr. Gershwin placed the onset of Petitioner's clinical symptoms

47

as December 17, 2018, 31 days after vaccination.  The undersigned does agree with both experts that Petitioner had an abrupt onset of shoulder and hip pain that began 31 days after vaccination, and that this presentation was consistent with PMR.  This finding, however, does not support an adaptive immune response here, because Petitioner failed to prove a causal mechanism implicating cytokines, even assuming they are produced as part of the adaptive immune response.  Thus, while Petitioner advances an adaptive immune response in support of <u>Althen</u> prong three, he did not prove a causal theory sufficient to satisfy <u>Althen</u> prong one.

Because <u>Althen</u> prong three coincides with <u>Althen</u> prong one, Petitioner's inability to meet his burden demonstrating how the flu vaccine can cause PMR effectively precludes him from being able to meet his burden under the third <u>Althen</u> prong.  Thus, because the undersigned found that Petitioner did not offer a sound and reliable theory of causation, he cannot demonstrate that his condition arose in a medically acceptable timeframe pursuant to that theory.  Even assuming Petitioner satisfied <u>Althen</u> prong three, that alone would not satisfy Petitioner's overall burden of proof.  <u>Veryzer</u>, 100 Fed. Cl. at 356 (explaining that a "temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting the vaccine and injury.").

Based on the evidence, the undersigned finds that Petitioner has failed to prove <u>Althen</u> prong three by a preponderant standard.

## IV.    CONCLUSION

The undersigned extends her sympathy to Petitioner for the pain and suffering he has experienced due to his illness.  The undersigned's Decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master